## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| [SEALED] | ) |
| | ) |
| v. | ) |
| | ) Civil Action File No.: |
| [SEALED] | ) |
| | ) |
| | ) _____ |
| | ) |
| | ) **ORIGINAL COMPLAINT** |
| | ) **FILED IN CAMERA AND** |
| | ) **UNDER SEAL PURSUANT TO** |
| _____ | ) **31 U.S.C. § 3730(b)(2)** |

**DO NOT PLACE IN PRESS BOX**

**DO NOT ENTER ON PACER**

**COMPLAINT and JURY DEMAND**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. MATTHEW P. PASULKA, | ) ) ) |
| Plaintiff-Relator, | ) Civil Action File No.: ) |
| v. | ) ) |
| BECHTEL NATIONAL, INC., BECHTEL CORPORATION, BWX TECHNOLOGIES, INC., WASHINGTON GROUP INTERNATIONAL, INC., URS ENERGY AND CONSTRUCTION, INC., AECOM ENERGY and CONSTRUCTION, INC., BATTELLE MEMORIAL INSTITUTE, LOS ALAMOS NATIONAL SECURITY, LLC, and TRIAD NATIONAL SECURITY, LLC. | ) _____ ) ) **ORIGINAL COMPLAINT** ) **FILED IN CAMERA AND** ) **UNDER SEAL PURSUANT TO** ) **31 U.S.C. § 3730(b)(2)** ) ) ) ) ) ) ) ) |
| Defendants. | |

_____

**<u>COMPLAINT and JURY DEMAND</u>**

The Plaintiff-Relator ("Relator"), Matthew P. Pasulka, on behalf of himself and on behalf of the United States of America, through his undersigned counsel, brings this action pursuant to the federal False Claims Act (31 U.S.C. §§ 3729-3733) against the Defendants, Bechtel National, Inc., Bechtel Corporation, BWX Technologies, Inc., Washington Group International, Inc.,  URS Energy and Construction, Inc., AECOM Energy and Construction, Inc., Battelle Memorial Institute, Los Alamos National Security, LLC, and Triad National Security, LLC, to recover all damages, treble damages, penalties, costs, awards and other remedies available to the United States and to the Relator under the False Claims Act and other applicable law, and alleges:

## I.    INTRODUCTION

1.      The Los Alamos National Laboratory (hereinafter sometimes referred to as "LANL") is one of our country's premier research and development facilities. Founded in 1943 to design and build the Atomic Bomb, today LANL's primary mission "… is to ensure our nation's security through nuclear deterrence – [including] stewardship of our nation's nuclear weapons to assure our allies and deter our adversaries." (https://lanl.gov/about/history-innovation/index.php ).

2.      While much of the research and development and other activities at LANL relate to nuclear weapons, LANL's  extensive taxpayer-funded facilities are

also used for a variety of other research and development work, such as nuclear and non-nuclear energy, and various projects for the Department of Energy, the Department of Defense, the Department of Homeland Security, the Department of Justice, the National Institute of Health, the Environmental Protection Agency and various private for profit and not-for-profit companies.

3.     LANL is administered by the Department of Energy's National Nuclear Security Agency (the "NNSA").

4.     The United States has traditionally enlisted the assistance of major academic research institutions and private entities to assist in the management and operation of national laboratories conducting complex and important research and development including at LANL.

5.     Since before 2006, the NNSA has contracted with groups of private entities that work together to manage and operate LANL under a contractual arrangement known as the "Prime Contract" whereby the private entities collectively form and operate as "the Prime Contractor."  From in or about December 2005 until November 2018, the Prime Contractor was formed and operated by a group of private entities led by Defendant Bechtel National, Inc. ("Bechtel"), a large and experienced government contractor.  Since November 2018, the Prime Contractor was formed and operated by a group of private entities

led by Defendant Battelle Memorial Institute ("Battelle"), another large and

experienced government contractor.



**LOS ALAMOS NATIONAL LABORATORY**

**PRIME CONTRACTORS**

2005-2018 and
2018-present

December
2005

November
2018

"Bechtel Prime Contractor Group"
- Bechtel National, Inc.
- BWX Technologies, Inc.
- Washington Group International
    (later URS Energy and Construction, Inc.;
    later AECOM Energy & Construction, Inc.)
- Los Alamos National Security, LLC

- University of California

November
2018

Present

"Battelle Prime Contractor Group"
- Battelle Memorial Institute
- Triad National Security, LLC

- University of California
- Texas A&M University

6.     Defendants Bechtel and Battelle, and their respective Prime Contractor Groups, each agreed to undertake the stewardship of LANL, including the several billions of taxpayer dollars appropriated by Congress for the management and operation of LANL during each of their respective tenures. LANL's website currently indicates that the President's Budget Request for 2021 includes an estimated $3.875 Billion for LANL's programmatic portfolio with 71% or $2.732 Billion for NNSA Weapons Programs.

7.     Defendants Bechtel and Battelle, and their respective Prime Contractor Groups, each persuaded the NNSA to select them as Prime Contractors by representing that they would contribute their considerable resources and experience in managing and operating large and complex research and development programs and facilities to make sure that LANL was operated effectively and properly as intended by, and on behalf of, the Government in accordance with the requirements of their respective Prime Contracts and the applicable statutes and regulations.

8.     Defendants Bechtel and Battelle, and their respective Prime Contractor Groups, further induced the NNSA to select them for the lucrative Prime Contractor positions by representing that they would establish auditing operations—independent and autonomous from Laboratory management-- to make

sure that LANL was managed and operated in the manner required by their Prime Contracts and that the federal funds, appropriated by Congress and entrusted to the Defendants, would be expended only in accordance with the Prime Contracts and the applicable statutes and regulations. One of the important responsibilities accepted by the Defendants, in order to secure the Prime Contract, was to ensure that the charges and billing system at LANL was operated effectively and with integrity so that the government paid only for allowable charges lawfully designated and eligible to be paid from the funds appropriated by Congress, and that the Prime Contractor bore the cost of unallowable charges and other amounts not payable by the government.

9. As a national laboratory conducting research and development at taxpayer expense, LANL was required to comply with various statutes enacted by Congress intended to increase and expand the intellectual property developed at taxpayer expense while encouraging and facilitating its transfer to the commercial marketplace where it would most benefit the public. Examples of such statutes include the Stevenson-Wydler Technology Innovation Act of 1980, 15 U.S.C. § 3701 *et seq*., providing for technology transfer through the private commercialization of intellectual property developed at taxpayer expense as well as a series of appropriations bills commencing in 1997 providing for expenditures

for Laboratory Directed Research and Development (hereinafter sometimes referred to as "LDRD").

10.     Defendants Bechtel and Battelle, and their respective Prime Contractor Groups, each represented to the NNSA that they would manage and operate the statutorily required technology transfer and LDRD activities at LANL through a mechanism set forth in the Prime Contracts requiring that a substantial portion of the costs of the technology transfer activities were designated as "unallowable" charges, or otherwise not payable by the government,  to be paid from funds generated by the research and development and technology transfer activities, from the Prime Contractors' substantial fees under the Prime Contract or otherwise covered by Defendants Bechtel and Battelle, and their respective Prime Contractor Groups, and would not be paid from federal funds appropriated by Congress except to the limited extent expressly stated in the Prime Contracts. Defendants Bechtel and Battelle, and their respective Prime Contractor Groups, were also required to abide by specific statutory prohibitions regarding payment for technology transfer and LDRD from funds appropriated for weapons activities and defense environmental cleanup.

11.     The Relator, Matthew Pasulka is a West Point Graduate, licensed engineer and a lawyer, with extensive intellectual property and government

contracting experience, who was hired at LANL by the Bechtel Prime Contractor Group in 2017, in a non-lawyer position.  The Relator was assigned to LANL's Feynman Center for Innovation (hereinafter sometimes referred to as "FCI"), the LANL division primarily responsible for the technology transfer/commercialization mission. In addition to his ordinary duties as a technology transfer and licensure professional, the Relator was tasked, by FCI's then Division Leader, a senior member of LANL management (referred to herein as "Mr. A"), with reviewing, identifying deficiencies in, and suggesting corrections to, LANL's  technology transfer activities and operations in advance of the expected transfer of management and operations responsibility to a new Prime Contractor in 2018.

12.    The Relator immediately encountered resistance by other members of the Bechtel Prime Contractor Group management team. The Relator soon discovered an ongoing and systemic practice, directed by management, of false and inaccurate billing for work, costs and expenses relating to technology transfer activities that deceptively concealed amounts required to be paid by the Prime Contractor and were unlawfully charged to and paid by the government.

13.    Further review by the Relator revealed that senior management was directing an ongoing and systemic practice of false representations and deceptive

omissions made to the government about the amount, nature and status of government-funded intellectual property, about the nature and extent of the Defendants' efforts to commercialize government-funded intellectual property, and about the Bechtel Prime Contractor Group's rights to exercise control and ownership over certain government funded intellectual property.

14.    The Relator reported his findings to Mr. A as he developed them, but Mr. A did not appear to the Relator to initiate corrective action.

15.    On or about February 22, 2018, Mr. A was unexpectedly replaced by a new senior manager, Mr. B, who promptly instructed the Relator to discontinue his operations review, and who demoted the Relator to another position.  The Relator continued to believe that it was necessary for the Bechtel Prime Contractor Group to fulfill its obligations under the Prime Contract, identify and correct the deficiencies he was discovering, and report them to the government in advance of the transition to a new Prime Contractor. However, when the Relator questioned Mr. B's contrary position, he was promptly terminated by Mr. B.

16.    The Relator's sudden termination from LANL by the Bechtel Prime Contractor Group caused him concern that the Bechtel Prime Contractor Group had no intention of disclosing the research and development and technology

transfer related improprieties to the Government or refunding any resulting overcharges the Government had paid as a result.

17.   The Relator's concerns that the Bechtel Prime Contractor Group would knowingly exploit the Prime Contractor's position of trust to overcharge the Government were heightened by the fact that the Bechtel Prime Contractor Group had represented to the Government that it would provide for a professional audit group--independent and autonomous from Laboratory management--to ensure that the kinds of deficiencies the Relator had discovered would never occur in the first place.

18.   Following his termination, the Relator decided to further investigate the actions of the Bechtel Prime Contractor Group at LANL and monitor the transition to the Battelle Prime Contractor Group, which had been selected by NNSA to take over the management and operation of LANL in November 2018. The Relator was hopeful that the Battelle Prime Contractor Group, with its own responsibility for providing professional oversight and internal and external audit, would identify and correct the material deficiencies the Relator had discovered and take necessary and appropriate action to make the Government whole.

19.   While the Relator was hopeful that the transition to a new Prime Contractor at LANL would resolve the substantial deficiencies he had reported to

11

the Bechtel Prime Contractor Group's management, the Relator was also aware that it was expected that most LANL employees, including scientists and management, would be re-employed by the Battelle Prime Contractor Group.

20.    The Relator eventually learned that, after the new Prime Contractor assumed control of LANL, Mr. B remained firmly in control at LANL, and the Battelle Prime Contractor Group did nothing to correct or stop the false statements, false billing records, and false reports about Government-owned intellectual property. Instead, the Battelle Prime Contractor Group kept the responsible management personnel in place and permitted them to perpetuate the deceptive practices of its predecessor, to the financial gain of the Battelle Prime Contractor Group and to the financial detriment of the Government.

21.    The Bechtel and Battelle Prime Contractor Groups have each perpetuated a fraudulent scheme at LANL whereby:

a. Charges for such items as maintenance of copyrighted data (sometimes referred to herein as "copyright maintenance") that should not have been billed to or  paid for by the Government, are falsely and fraudulently billed as allowable charges under a general technology transfer code, under overhead or administration, or under programs paid for from appropriated funds, to dupe the Government into paying

12

for activities that the Prime Contractor, and not the Government, is responsible for paying.

b.  Other charges for the research and development and technology transfer of intellectual property are falsely and fraudulently billed to overhead, administration, or projects or programs paid for from appropriated funds or billed under false codes to dupe the Government into paying for activities that the Prime Contractor, and not the Government, is responsible for paying.

c.  Charges for unallowable items such as promotional activities to benefit the Prime Contractor are falsely and fraudulently billed to the Government.

d.  False records are submitted to the Government to deceive it as to the nature, status, and existence of intellectual property paid for by the taxpayer.

e.  False records are submitted to the Government to deceive it as to the nature, status, and performance of technology transfer activities required to be performed under the Prime Contract with respect to intellectual property paid for by the taxpayer.

f.   Charges and costs arising from research and development and technology transfer are being paid from funds appropriated for weapons activities and/or defense environmental cleanup when prohibited.

g.   The Battelle Prime Contractor Group failed to disclose to the Government the existence of the fraudulent scheme already in existence at the time of transition from the Bechtel to the Battelle Prime Contractor Group.

22.    The Bechtel and Battelle Prime Contractor Groups each acted "knowingly," as that term is defined by the federal False Claims Act (31 U.S.C. §3729(b)(1)), in perpetuating the fraudulent scheme alleged herein and in falsely representing to the Government that they would provide, were providing and had provided, management resources, oversight and the required auditing of the management and operation of LANL that, if provided as represented, would have prevented the perpetuation of the fraudulent scheme and the resulting damages to the Government.

23.    The Relator estimates that the fraudulent scheme perpetuated by the Defendants has caused the Government to incur damages in excess of $10 million

annually commencing before May 1, 2015, and continuing and ongoing as of the commencement of this action.

24.    The Bechtel Prime Contractor Group's termination of the Relator's employment at LANL was in retaliation for the Relator's acts to identify, report, stop and correct conduct in violation of the federal False Claims Act and, therefore, the Relator's acts were subject to the protections, remedies and relief provided by 31 U.S.C. § 3730(h).

25.    The Relator brings this action pursuant to the *qui tam* provisions of the False Claims Act (31 U.S.C. § 3730) to recover, on behalf of the United States, multiple damages and penalties as provided by 31 U.S.C. § 3729(a), as well as the costs incurred by the United States in this action as provided by 31 U.S.C. § 3729(a)(3).

26.    The Relator further seeks on behalf of himself, an award from the proceeds of this action as provided by 31 U.S.C. § 3730(d), an award of the Relator's costs, expenses and attorney's fees as provided by 31 U.S.C. § 3730(d), and an award of any and all multiples of back pay, damages, costs, expenses, attorneys fees and other relief provided by 31 U.S.C. § 3730(h).

**II.    TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................3

II.     TABLE OF CONTENTS ....................................................................16

III.    JURISDICTION AND VENUE ..........................................................18

IV.     THE PARTIES ....................................................................................18

V.      THE DEFNDANTS' DUTIES UNDER THE PRIME CONTRACTS, REGULATIONS AND STATUTES .........................................................27

VI.     THE RELATOR'S BACKGROUND AND EXPOSURE TO THE DEFENDANTS' FRAUDULENT SCHEME ............................................53

VII.    THE DEFENDANTS' FRAUDULENT SCHEME ......................................65

VIII.   SPECIFIC FALSE CLAIMS ACT VIOLATIONS RESULTING FROM THE FRAUDULENT SCHEME ..................................................91

IX.     THE COUNTS ................................................................................100

          COUNT I ..........................................................................................100

          VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (A)) ......................................................................................................100

          Presenting False or Fraudulent Claims for Payment or Approval ...........100

          COUNT II ..........................................................................................102

          VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (B)) ......................................................................................................102

          False Records or Statements Material to a False or Fraudulent Claim .....102

          COUNT III ..........................................................................................105

          VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (D)) ......................................................................................................105

          Delivering Less Than all Money or Property to the Government ...........105

          COUNT IV ..........................................................................................108

VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (E))...........................................................................................108

Making or Delivering a Document Certifying Receipt of Property..........108

to Defraud the Government.....................................................................108

COUNT V ...............................................................................................112

VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (G)) ..........................................................................................112

False Record or Statement Material to, or Improperly Avoiding or Decreasing, an Obligation to Pay or Transmit ...........................................112

Money or Property to the Government .....................................................112

COUNT VI ...............................................................................................115

VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (C)) ..........................................................................................115

Conspiring to Commit Violations of the False Claims Act .....................115

COUNT VIII .............................................................................................122

RELATOR'S CLAIM FOR RELIEF DUE TO RETALIATORY ACTIONS PURSUANT TO THE FALSE CLAIMS ACT (31 U.S.C. § 3730 (h)).................................................................................................122

Retaliation Against Relator for Lawful Acts in Furtherance of an Action Under, or to Stop Violations of, the False Claims Act .............................122

X.     PRAYER FOR RELIEF ...........................................................................123

17

III.   **JURISDICTION AND VENUE**

27.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.

28.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

29.    This Court has personal jurisdiction over the Defendants, and venue is proper in this District, pursuant to 28 U.S.C. § 1391 and 32 U.S.C § 3732(a) because one or more of the Defendants transacts business in this District.

IV.   **THE PARTIES**

30.    The Relator Matthew P. Pasulka brings this *qui tam* action on behalf of the United States pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729-3733.

31.    The Relator is a 1992 graduate of the United States Military Academy who was initially commissioned in the Army as an engineer officer after receiving a Bachelor of Science degree in Civil Engineering.  He later attended law school, became licensed as an attorney, and was branch transferred to the Army's Judge Advocate General's Corps.  The Relator served in a variety of assignments as a Regular Army officer, and later in the Reserves, including some relating to government contracts involving complex technology. In 2004, the Relator

18

completed a second Bachelor of Science degree, this time in Electrical Engineering. He has held Professional Engineer licenses in Virginia, is currently admitted to the Bars of Illinois and Nevada, and was previously a member of the Bars of South Carolina and Minnesota. The Relator is also admitted to and an active member of the Bar of the U.S. Patent and Trademark Office. After leaving active-duty military service, the Relator practiced law until becoming employed in the non-lawyer position described below.  He has held TS-SCI clearance and currently holds a Q clearance.

32.    The Relator resides in Santa Fe, New Mexico, and was employed in 2017 and 2018 by Defendant Los Alamos National Security, LLC as a Technology Transfer Professional at LANL.  LANL is a "government-owned, contractor-operated" ("GOCO") research laboratory funded by federal taxpayers.  While performing his duties at LANL in 2017 and 2018, the Relator directly observed the widespread corruption and fraudulent misconduct in violation of the Federal False Claims Act alleged herein.  Thereafter, Relator developed additional information pertinent to this action showing the ongoing and expanded nature of the Defendants' fraudulent scheme.

33.    LANL is part of the Department of Energy's National Nuclear Security Administration (referred to above and elsewhere as "NNSA"). LANL was

created by the United States in 1943 to design and build the atomic bomb, and it continues to be primarily responsible for the development and stewardship of the nation's nuclear weapons. LANL also engages in a variety of other scientific research intended to benefit the United States and the taxpayer.

34.    The United States' national laboratories have traditionally been operated through collaborations with research-oriented universities and private business organizations capable of facilitating and managing the scientifically robust public-private partnerships that have been essential to important technological advancements such as the atomic bomb and later generations of nuclear weapons. In recent years, LANL, like many other government research and development and engineering facilities, has been managed and operated by a private entity known as the "Prime Contractor" under an agreement known as "the Prime Contract."

35.    The University of California was historically the primary university involved in the management and operation of LANL.  Before 2006, the NNSA and Department of Energy determined that it is in the best interests of the United States for LANL to be managed and operated by a combined Prime Contractor entity (referred to herein as "Prime Contractor Group") composed of one or more research-oriented universities as well as non-government business organizations

20

who would each accept responsibility for the management and operation of LANL and share in liability for certain matters, including, but not limited to, the activities alleged herein.  Accordingly, the United States required the member entities comprising the Prime Contractor to each accept responsibility and liability for the Prime Contractor's management and operation of LANL and that they further bind their ultimate parents and affiliates.

36.     The acceptance of total responsibility by the entire Prime Contractor Groups, including all parent organizations, included  specific requirements that the parents conduct oversight and appraisal of the performance and operations of the Prime Contractor entities that the parent organizations put in place to manage and operate LANL, and that the parents ensure that the Prime Contractor entities implement effective internal controls, including with respect to the research and development and technology transfer activities required by the Prime Contracts. The parent entities of the Prime Contractor Groups were further required to establish and conduct ongoing audit operations—independent and autonomous from Laboratory Management--of the management and operation of LANL. Honest fulfillment of these "parent" auditing responsibilities would have prevented the perpetuation of the fraudulent scheme alleged herein, had the auditing activities been conducted in good faith as the Prime Contractor Groups promised and

represented. Instead, the Prime Contractor Groups chose a dishonest approach that capitalized on their fraud and false statements, as described herein.

37.    Since approximately 2005, the NNSA has contracted with only two Prime Contractor Groups to manage and operate LANL under a Government Owned Contractor Operated ("GOCO") arrangement; the Bechtel Prime Contractor Group, from approximately December 2005 until November 2018, followed by the Battelle Prime Contractor Group, from November 2018 to date.

38.    The Bechtel Prime Contractor Group was comprised of the University of California, Defendant Bechtel National, Inc., Defendant BWX Technologies, Inc., and Defendant Washington Group International, Inc. (which was later acquired by Defendant URS Corp. and then Defendant AECOM), as well as Los Alamos National Security, LLC, the subordinate entity of the Bechtel Prime Contractor Group.

39.    The Battelle Prime Contractor Group is comprised of the University of California, Texas A&M University System and Battelle Memorial Institute, as well as Triad National Security, LLC, the subordinate entity of the Battelle Prime Contractor Group.

40.    Defendant Los Alamos National Security, LLC (hereinafter sometimes referred to as "LANS") is a Limited Liability Company incorporated,

not for profit, in Delaware in 2005 that established and maintained its principal place of business in Los Alamos, New Mexico.  LANS acted as the subordinate entity of the Bechtel Prime Contractor Group to operate and manage the Los Alamos National Laboratory until November 2018, when it was succeeded by the Battelle Prime Contractor Group and its subordinate entity, Defendant Triad National Security, LLC.

41.    Defendant Los Alamos National Security, LLC was formed and is owned by the following members: The University of California, Defendant Bechtel National, Inc., Defendant BWX Technologies, Inc., and Defendant Washington Group International, Inc. (now Defendant AECOM). Each of the LANS members joined in the management and operation of LANL and, together with their ultimate parents and affiliates, are liable to the government for the False Claims Act violations alleged herein.

42.    Defendants Bechtel National, Inc. and Bechtel Corporation (hereinafter sometimes referred to as "Bechtel") are Nevada corporations with their principal places of business in Reston, Virginia. Bechtel was registered to do business in Georgia during the time at issue in this action and conducts its business operations throughout the United States, including, upon information and belief,

within the Northern District of Georgia. Bechtel's ultimate parent and affiliates share Bechtel's liability to the United States arising from this action.

43.    Defendant Washington Group International (hereinafter sometimes referred to as "WGI") was a Delaware corporation with its principal place of business in Boise, Idaho that, after execution of the LANL Prime Contract, was acquired by Defendant URS Energy and Construction, Inc. in 2007. WGI conducted business operations throughout the United States, including upon information and belief in the Northern District of Georgia.

44.    Defendant AECOM Energy and Construction, Inc.  (hereinafter sometimes referred to as "AECOM") is an Ohio Corporation, with its principal place of business in Greenwood Village, Colorado.  AECOM acquired, and is the successor in interest to, URS Energy and Construction and Washington Group International, Inc. and remains responsible for the duties, obligations and liabilities of WGI and URS with respect to LANL. AECOM has been registered to do business in the State of Georgia throughout the time at issue in this action and conducts business throughout the United States, including, upon information and belief within the Northern District of Georgia. AECOM's ultimate parent and affiliates share AECOM's liability to the United States arising from this action.

45.     Defendant BWX Technologies Inc. (hereinafter sometimes referred to as "BWX") is a Delaware Corporation with its principal place of business in Lynchburg, Virginia that was registered to do business in Georgia during the time at issue in this action and conducts its business operations throughout the United States, including, upon information and belief, within the Northern District of Georgia.  BWX's ultimate parent and affiliates share BWX's liability to the United States arising from this action.

46.     Defendant Triad National Security, LLC (hereinafter sometimes referred to as "Triad") is a Limited Liability Company incorporated, not for profit, in Delaware in 2017 that established and maintains its principal place of business in Los Alamos, New Mexico.  Triad has acted as the Prime Contractor responsible for operating and managing the Los Alamos National Laboratory since November 2018.

47.     Defendant Triad National Security, LLC was formed and is owned by the following members: The Regents of the University of California, Texas A&M University System and Battelle Memorial Institute.  Each of the Triad members joined in the management and operation of LANL and, together with their ultimate parents and affiliates, are liable to the government for the False Claims Act violations alleged herein.

25

48.     Defendant Battelle Memorial Institute (hereinafter sometimes referred to as "Battelle") is an Ohio not for profit corporation, incorporated in 1925, with its principal place of business in Columbus, Ohio. Battelle conducts its business operations throughout the United States, including within the Northern District of Georgia, and was registered to do business in Georgia during the time at issue in this action.  Battelle's ultimate parent and affiliates share Battelle's liability to the United States arising from this action.

49.     Although the Battelle Prime Contractor Group replaced the Bechtel Prime Contractor Group as the Prime Contractor at LANL in November 2018, various managers and other individuals have directed both Prime Contractor Groups' operations at LANL.  That continuity of management is an important fact in demonstrating the knowing and intentional corruption by the Defendants under both Prime Contractor Groups' tenures.

50.     A significant example of this continuity of management at LANL is a senior manager whose identity the Relator has provided to the Government and is referred to herein as "Mr. B."  Mr. B has worked in various capacities at Los Alamos National Laboratory since 1983, including employment by LANS commencing in 2006, and then by Triad from November 2018. Mr. B was appointed by LANS to the position of Division Leader of the Richard P. Feynman

26

Center for Innovation ("FCI") on or about February 22, 2018, where he served as a senior manager of the technology transfer function at the Los Alamos National Laboratory during the transition of the Prime Contract for management and operation of the National Laboratory from the Bechtel Prime Contractor Group to the Battelle Prime Contractor Group.   Mr. B then became employed by Triad in November 2018 and continued in his senior management position overseeing the technology transfer function.  From February 2018 until July 2018, Mr. B was the senior management official under whom the Relator worked and was responsible for terminating the Relator's employment after the Relator informed senior management of his concerns regarding the fraudulent activities alleged herein.  The Defendants are liable for the acts and omissions of Mr. B and other members of management and employees alleged herein.

## V.   THE DEFNDANTS' DUTIES UNDER THE PRIME CONTRACTS, REGULATIONS AND STATUTES

51.    Prime Contracts for the management and operation of major GOCO research and development facilities such as LANL are much sought after by major government contractors like the Defendants. Long term GOCO engagements are very lucrative for the Prime Contractor Group as they generate large dollar fees, while putting the Prime Contractor Group members in superior positions to secure other profitable government and private contracts and to benefit from the

27

commercial opportunities afforded by the new and emerging technologies resulting

from the taxpayer-funded research and development programs that the Government

pays the Prime Contractor to manage and operate.

52.     To be selected as the LANL Prime Contractor, the Defendants had to

persuade the NNSA that they had sufficient successful experience and the

significant financial, management, technical, audit, organizational and other

resources required to effectively manage and operate a large, complex,

sophisticated, and multi-faceted national laboratory such as LANL.

53.     An essential pre-requisite to an award of a LANL Prime Contract was

the Defendants' promise that the corporate parents of the Prime Contractor Group

would provide independent, competent, effective, and continuous oversight and

auditing of LANL's management and operations. Such oversight and audit of the

billing and charges system was of special importance because of the multitude of

Government programs and other government and private research and

development activities at LANL. The billing and charges system had to function in

an effective and accurate manner so that the Government would only pay amounts

for eligible and allowable charges for approved Government programs and

activities from funds appropriated by Congress and the Prime Contractor would

retain financial responsibility and pay for activities giving rise to certain ineligible

or unallowable charges. The Prime Contract thus implemented a public-private partnership where the Prime Contractor would be well paid to use the Government's funds to manage and operate the Los Alamos National Laboratory, including all of its projects and programs, and to employ all or most of the more than 12,000 scientists, technologists, engineers, managers and others working there. However, for the public-private partnership to work, the Prime Contractor Group was required to competently implement and operate a charges and billing system that would honestly identify and segregate the amounts payable by the Government from the amounts payable from the Prime Contactor's own funds.

54.    The integrity and reliability of the Prime Contractor Group is thus critical, because the Prime Contractor serves as the steward of more than $ 2 billion of taxpayer dollars each year, appropriated by Congress for the payment of eligible and approved costs and charges for numerous Government programs and activities at LANL, while overseeing the billing and charges system that must transparently distinguish the unallowable charges, to be borne by the Prime Contractor Group and not the taxpayer.

55.    The LANL Prime Contract contained provisions, pertinent to this action, which provided for the following:

a.  The Prime Contractor was required to manage and operate all of LANL and its programs and activities, including those relating to research and development and technology transfer.

b.  The Prime Contractor would use appropriated Government funds of more than $2 billion annually to manage and operate LANL.

c.  While some of the Government funds used by the Prime Contractor had been appropriated by Congress for the NNSA, some of the funds used in the management and operation of LANL and its programs and activities had been appropriated by Congress for research and development and other activities conducted at LANL by or for other federal agencies and departments.

d.  The Prime Contractor would be authorized to draw on appropriated funds to cover its eligible and allowable charges for the management and operation of LANL, but was not permitted to use appropriated funds to pay for activities the Prime Contractor was required to pay for.

e.  In addition to payment from Government funds for eligible and allowable charges submitted and billed, the Prime Contractor was compensated by a lucrative fee, in part reflective of the overall

amount of appropriated Government funds expended for the management and operation of LANL and its programs and activities.

f.  As a national laboratory, LANL was required by federal statutes to establish, operate, and maintain  research and development and technology transfer functions and activities that would benefit the taxpayer by facilitating innovation and then commercialization of the valuable intellectual property developed at LANL at the taxpayer's expense.

g.  While LANL was required to conduct research and development and technology transfer activities, the Prime Contract and applicable statutes and regulations restricted the use of federal funds appropriated for certain government programs and activities at LANL.

h.  As a national laboratory, LANL was also expected to conduct Laboratory Directed Research and Development ("LDRD") projects; however, as with technology transfer, the Prime Contractor was prohibited from paying for LDRD with funds appropriated for weapons activities or defense environmental cleanup except under specific circumstances.

i.   The NNSA included provisions in the Prime Contract limiting the
amount of federal funds that the Prime Contractor could charge the
Government for technology transfer activities, provided substantial
limitations on when federal funds could be used for maintenance of
copyrighted data (intellectual property)  and specified the
circumstances and conditions under which the Prime Contractor could
maintain ownership rights over Government intellectual property
developed at the taxpayer's expense.

j.   The Prime Contract thus required the Prime Contractor to carefully
and accurately bill research and development and technology transfer
related charges so that only eligible, allowable and authorized charges
would be paid from the Government's funds and other ineligible,
unallowable and unauthorized charges would be paid from the Prime
Contractor's funds.

k.   The research and development and technology transfer opportunities
provided for under the Prime Contract, including those requiring the
Prime Contractor to pay  for certain costs and charges from its own
funds, provided substantial benefits to the Prime Contractor; however,
the Prime Contractor was required to carry out all activities in good

faith to achieve their intended purpose of facilitating innovation and the transfer of technological innovations to the commercial marketplace, where they would most benefit the taxpayer.

56.   The research and development and technology transfer functions at LANL were provided for by several statutes and Executive Orders, including, but not limited the following:

a. Bayh-Dole Act of 1980. (P.L. 96-517).

b. Stevenson-Wydler Technology Innovation Act of 1980. (P.L. 96-480).

c. Small Business Innovation and Development Act of 1982. (P.L. 97-219).

d. Federal Technology Transfer Act of 1986. (P.L. 99-502).

e. Exec. Order No. 12591 (1987).

f. Omnibus Trade and Competitiveness Act of 1988. (P.L. 100-418).

g. National Competitiveness Technology Transfer Act of 1989. (P.L. 101-189).

h. American Technology Preeminence Act of 1991. (P.L. 102-245).

i. National Department of Defense Authorization Act for 1994. (P.L. 103-160).

j.  National Technology Transfer and Advancement Act of 1995. (P.L. 104-113).

k.  Technology Transfer Commercialization Act of 2000. (P.L. 106-404).

l.  Energy Policy Act of 2005. (P.L. 109-58).

m. America Competes Act (P.L. 110-69).

n.  America Invents Act of 2011. (P.L. 112-29).

o. 50 U.S.C. §§ 2791-2795 and various appropriations bills cited therein.

57.     Through these statutes, Congress provided for, and incentivized, the development of new technologies through public private partnerships and created a pathway for the transfer of such important emerging technologies into the commercial marketplace.  The LANL Prime Contractors were provided with valuable opportunities to benefit from the transfer and commercialization of Government funded technology, but were first and foremost required to manage and operate LANL as they had promised in their Prime Contracts and to otherwise comply with the requirements and limitations imposed by Congress and the applicable regulations.

58.     Congress has thus gone to great lengths over the years to encourage and facilitate technological innovations through national laboratories and other

federal facilities, as well as the commercialization of the resulting taxpayer funded intellectual property through required technology transfer activities.

59.    Congress has also limited when, and to what extent, federal funds can be used to pay for research and development and technology transfer activities at national laboratories which, by their very nature, involve public private partnerships benefiting the Government, as well as private participants such as the Defendants, who are required to share in the costs.

60.    The United States Government implemented the statutory research and development and technology transfer requirements and restrictions in the Department of Energy Acquisition Regulations, DOE Orders, and Federal Acquisition Regulations and applied them to the Prime Contracts, including limitations and restrictions on Government payments for research and development and technology transfer activities at LANL and the requirement that the Prime Contractor share in their cost.

61.    The Federal Acquisition Regulations Governing Department of Energy contracts, including the LANL Prime Contracts, appear at Volume 9 Chapter 48, Volume 9, of the Code of Federal Regulations. These Department of Energy Acquisition Regulations are sometimes referenced by the prefix "DEAR." DOE Order 413.2C  governs LDRD at LANL.

62.     DEAR 970.5227.3 required that the following description of the technology transfer mission be incorporated in the Prime Contracts:

"This clause has as its purpose implementation of the National Competitiveness Technology Transfer Act of 1989 (Sections 3131, 3132, 3133, and 3157 of Pub. L. 101-189 and as amended by Pub. L. 103-160, Sections 3134 and 3160). The Contractor shall conduct technology transfer activities with a purpose of providing benefit from Federal research to U.S. industrial competitiveness.

(a) Authority.

(1) In order to ensure the full use of the results of research and development efforts of, and the capabilities of, the Laboratory, technology transfer, including Cooperative Research and Development Agreements (CRADAs), is established as a mission of the Laboratory consistent with the policy, principles and purposes of Sections 11(a)(1) and 12(g) of the Stevenson-Wydler Technology Innovation Act of 1980, as amended (15 U.S.C. 3710a); Section 3132(b) of Pub. L. 101-189, Sections 3134 and 3160 of Pub. L. 103-160, and of Chapter 38 of the Patent Laws (35 U.S.C. 200 *et seq.*); Section 152 of the Atomic Energy Act of 1954, as amended (42 U.S.C. 2182); Section 9 of the Federal

Nonnuclear Energy Research and Development Act of 1974 (42 U.S.C. 5908); and Executive Order 12591 of April 10, 1987.

(2) In pursuing the technology transfer mission, the Contractor is authorized to conduct activities including but not limited to: identifying and protecting Intellectual Property made, created or acquired at or by the Laboratory; negotiating licensing agreements and assignments for Intellectual Property made, created or acquired at or by the Laboratory that the Contractor controls or owns; bailments; negotiating all aspects of and entering into CRADAS; providing technical consulting and personnel exchanges; conducting science education activities and reimbursable Strategic Partnership Projects (SPP); providing information exchanges; and making available laboratory or weapon production user facilities. It is fully expected that the Contractor shall use all of the mechanisms available to it to accomplish this technology transfer mission, including, but not limited to, CRADAS, user facilities, SPP, science education activities, consulting, personnel, [sic] assignments, and licensing in accordance with this clause."

63.     DEAR 970.5227-3 (b) (2) broadly defined the term "Intellectual Property" to include:

"patents, trademarks, copyrights, mask works, protected CRADA information, and other forms of comparable property rights protected by Federal Law and other foreign counterparts."

64.    DEAR 970.5227-3 next provided for the public-private sharing of technology transfer and commercialization costs by placing a limitation on the amount of the costs that will be deemed "allowable" and payable by the Government:

(c) Allowable Costs

(1) The Contractor shall establish and carry out its technology transfer efforts through appropriate organizational elements consistent with the requirements for an Office of Research and Technology Applications (ORTA) pursuant to paragraphs (b) and (c) of Section 11 of the Stevenson-Wydler Technology Innovation Act of 1980, as amended (15 U.S.C. 3710). The costs associated with the conduct of technology transfer through the ORTA including activities associated with obtaining, maintaining, licensing, and assigning Intellectual Property rights, increasing the potential for the transfer of technology, and the widespread notice of technology transfer opportunities, shall be deemed allowable provided that such costs meet the other requirements of the allowable

costs provisions of this Contract. In addition to any separately designated

funds, these costs in any fiscal year shall not exceed an amount equal to

0.5 percent of the operating funds included in the Federal research and

development budget (including Strategic Partnership Projects) of the

Laboratory for that fiscal year without written approval of the contracting

officer."

(DEAR 970.5227-3 Technology Transfer Mission. (3/24/2015), Fed. Acq. Reg.

Archive 6901339.)

65.     DEAR 970.5227-3 (c) (1) thus required the Prime Contractors to

"establish and carry out" all of the required technology transfer activities and that

the Prime Contractors cover all resulting costs in excess of the allowable "0.5

percent of the operating funds included in the Federal research and development

budget" unless Federal funds were "separately designated," or the Prime

Contractor secured the "written approval of the contracting officer."  This

important public- private cost sharing requirement of the Prime Contracts will be

referred to herein as the "One Half of One Percent Limitation."

66.     Other important Prime Contract provisions for the public-private

sharing of technology transfer and commercialization costs relate to intellectual

property potentially subject to copyright protection (referred to generally as "data"

in the Prime Contract), including, but not limited to, computer code and procedures and scientific and technical writings. The volume of intellectual property materials potentially protectable by copyright vastly exceeded the number of patents subject to the Prime Contract and, in the case of such copyrights, the potential benefit to the Prime Contractor, of taking action to maintain copyrights, ordinarily greatly exceeded the potential benefit to the Government, if any. Accordingly, the DOE regulations require that the Prime Contractor represent to the Government that it plans to commercialize the intellectual property over which it seeks to assert a copyright but also, with certain limited exceptions, require the Prime Contractor to pay the costs of maintaining the copyrighted intellectual property in its own name.

67.    DEAR 970-5227-2 sets forth the rights and requirements relating to intellectual property potentially subject to copyright under the Prime Contracts, specifically that the Government owns "all recorded information regardless of form or media on which it may be recorded" and includes "all technical data and computer software first produced in the performance of this Contract." DEAR 970-5227-2 (b) (1) (i).

68.    DEAR 970.5227- 2 (e) sets forth the requirements the Prime Contractor must meet to request and secure Government permission to assert

copyright protections, including, but not limited to, the following statement required at DEAR 970.5227-2(e)(i)(E) that:

> "… the Contractor plans to commercialize the data in compliance with the clause of this contract entitled, "Technology Transfer Mission," within five (5) years after obtaining permission to assert copyright or, on a case-by-case basis, a specified longer period where the Contractor can demonstrate that the ability to commercialize effectively is dependent upon such longer period…"

69.     In addition to the required Prime Contractor representation that it plans to commercialize the intellectual property over which it seeks to assert a copyright for its own benefit, DEAR 970.5227-2 (e) (3) (viii) further requires:

> "At any time the Contractor abandons commercialization activities for data for which the Contractor has received permission to assert copyright in accordance with this clause, it shall advise OSTI and Patent Counsel and upon request assign the copyright to the Government so that the Government can distribute the data to the public."

70.     As alleged above, in compliance with the applicable statutes and regulations, the NNSA Prime Contracts required that the Prime Contractors ordinarily pay, from their own funds, the costs incurred in seeking Government

approval to assert and commercializing a copyright benefiting the Prime

Contractor. Specifically, DEAR 970.5227-2 (e) (3) (vii) provides:

> "No costs shall be allowable for maintenance of copyrighted data, primarily
>
> for the benefit of the Contractor and/or a licensee which exceeds DOE
>
> Program needs, except as expressly provided in writing by the contracting
>
> officer. The Contractor may use its net royalty income to effect such
>
> maintenance costs."

71.     The regulations applicable to and incorporated in the Prime Contracts

thus imposed three important requirements on the Prime Contractors with respect

to government funded intellectual property over which the Prime Contractor elects

to maintain the copyrights:

> a. The Prime Contractor must truthfully represent to the Government that
>
>    it, in good faith, has a legitimate plan to commercialize a specific item
>
>    of Government owned intellectual property when seeking the
>
>    Government's approval to assert a copyright over it.
>
> b. The Prime Contractor has a duty to promptly and truthfully inform the
>
>    Government when it no longer has a legitimate plan (or has
>
>    abandoned any efforts) to commercialize a specific item of

Government owned intellectual property over which it has previously

secured the Government's approval to assert a copyright.

c. The Prime Contractor may not bill he Government for unallowed

copyright maintenance charges.  DEAR 970.5227-2(e).

d. All costs relating to copyrights are nonetheless subject to the One-Half

of One Percent Limitation.

72.     Through the National Department of Defense Authorization Act for

1994 (P.L. 103-160), Congress extended technology transfer policy to national

laboratories engaged in weapons production. However, as set forth in 50 U.S.C. §

2792, Congress restricted the expenditure of funds for technology transfer or

LDRD when the funds are appropriated for weapons activities or defense

environmental cleanup:

(a) **Limitation on use of weapons activities funds.** No funds authorized to be appropriated or otherwise made available to the Department of Energy in any fiscal year after fiscal year 1997 for weapons activities may be obligated or expended for activities under the Department of Energy Laboratory Directed Research and Development Program, or under any Department of Energy technology transfer program or cooperative research and development agreement, unless such activities support the national security mission of the Department of Energy.

(b) **Limitations on use of certain other funds.** No funds authorized to be appropriated or otherwise made available to the Department of Energy in any fiscal year after fiscal year 1997 for defense environmental cleanup may be obligated or expended for activities under the Department of Energy Laboratory Directed Research and Development Program, or under any Department of Energy technology transfer program or cooperative research

and development agreement, unless such activities support the defense environmental cleanup mission of the Department of Energy.

73.     Many of the government programs at LANL involve weapons activities and defense environmental cleanup. Therefore, the Prime Contractor was prohibited from charging technology transfer activities or Laboratory Directed Research and Development to overhead or other codes that could result in unauthorized payments, in whole or in part, from government funds appropriated for weapons activities or defense environmental cleanup. Funding for both technology transfer activities and LDRD is based on percentages of amounts otherwise appropriated for government funded activities and programs, i.e., "0.5 percent of the operating funds included in the Federal research and development budget" in the case of technology transfer activities and, per the Consolidated and Further Continuing Appropriations Act, 2014, P.L. 113- 076, a 6% cap in the case of LDRD.

74.     The management and operation of LANL necessitated a system for identifying and billing direct and indirect costs and charges to specific programs, facilities, and activities and for apportioning general overhead and administration costs among the many programs and facilities, in a manner whereby the Prime Contractor could ensure that federal funds would only be spent to cover eligible, "allowable" and approved charges. The statutory limitation on the use of DOE

44

funds appropriated for weapons activities and defense environmental cleanup, made it essential that any and all technology transfer and LDRD related costs and charges be charged to specifically identifiable and appropriate codes, accounts or pools so that weapons activities and defense environmental cleanup programs were not saddled with overhead or other charges relating to LDRD or technology transfer except as specifically authorized and eligible.

75.   DEAR 970.5232-3 provides in part:

(a) Accounts, records, and inspection, provided:

*"Accounts.* The Contractor shall maintain a separate and distinct set of accounts, records, documents, and other evidence showing and supporting: all allowable costs incurred; collections accruing to the Contractor in connection with the work under this contract, other applicable credits, negotiated fixed amounts, and fee accruals under this contract; and the receipt, use, and disposition of all government property coming into the possession of the Contractor under this contract. The system of accounts employed by the Contractor shall be satisfactory to DOE and in accordance with generally accepted accounting principles consistently applied."

76.     The NNSA required the Prime Contractor to accurately document all costs and charges and assign, charge and bill them under specific codes that would enable the Prime Contractor to ensure that direct or indirect charges or costs were not improperly billed to, or included in the overhead apportioned to, programs, facilities and activities funded by amounts not appropriated for LDRD or technology transfer, and that the government was not billed, or duped into paying, for ineligible, unallowable or unauthorized charges.

77.     The DOE regulations and the Prime Contract imposed the following additional billing and record requirements on the Prime Contractor with respect to technology transfer activities:

a.     DEAR 970.5227-3(k) *Records.*

The Contractor shall maintain records of its technology transfer activities in a manner and to the extent satisfactory to the DOE and specifically including, but not limited to, the licensing agreements, assignments and the records required to implement the requirements of paragraphs (e), (f), and (h) of this clause and shall provide reports to the contracting officer to enable DOE to maintain the reporting requirements of Section 12(c)(6) of the Stevenson-Wydler Technology Innovation Act of 1980, as amended (15 U.S.C.

3710a(c)(6)). Such reports shall be made annually in a format to be agreed upon between the Contractor and DOE and in such a format which will serve to adequately inform DOE of the Contractor's technology transfer activities while protecting any data not subject to disclosure under the Rights in Technical Data clause and paragraph (n) of this clause. Such records shall be made available in accordance with the clauses of this Contract pertaining to inspection, audit and examination of records.

b.  DEAR 970.5227-3(l) Reports to Congress.

To facilitate DOE's reporting to Congress, the Contractor is required to submit annually to DOE a technology transfer plan for conducting its technology transfer function for the upcoming year, including plans for securing Intellectual Property rights in Laboratory innovations with commercial promise and plans for managing such innovations so as to benefit the competitiveness of United States industry. This plan shall be provided to the contracting officer on or before October 1st of each year.

c.  DEAR 970.5227-3 (m) Oversight and appraisal.

> The Contractor is responsible for developing and implementing effective internal controls for all technology transfer activities consistent with the audit and record requirements of this Contract. Laboratory Contractor performance in implementing the technology transfer mission and the effectiveness of the Contractor's procedures will be evaluated by the contracting officer as part of the annual appraisal process, with input from the cognizant Secretarial Officer or program office.

78.     In order for the Prime Contractor Groups to qualify for the award of a Prime Contract, DOE regulations required that the members of the group create an entity to perform the Prime Contractor functions and to review and guaranty its performance, including as to the technology transfer activities and the enhanced billing and record responsibilities. DEAR 970.5209.1, Requirement for Guaranty of Performance, provided:

> The successful offeror is required by other provisions of this solicitation to organize a dedicated corporate entity to carry out the work under the contract to be awarded as a result of this solicitation. The successful offeror will be required, as part of the determination of responsibility of the newly organized, dedicated corporate entity and as a condition of the award of the

contract to that entity, to furnish a guarantee of that entity's performance. That guarantee of performance must be satisfactory in all respects to the Department of Energy.

79.    The Bechtel and Battelle Prime Contractor Groups provided the performance guarantees required by DOE and further agreed, in their respective Prime Contracts, that all Defendants would provide enhanced support, oversight and independent auditing such as that required in the following excerpt from the Triad Prime Contract:

3.3 Parent Organization(s)

(i) The Contractor is encouraged to identify opportunities to use parent corporate systems and corporate home and branch office personnel for Laboratory operations for the purposes of monitoring Laboratory performance, assisting the Laboratory in meeting its mission and operational requirements, streamlining the Contractor's administrative and business systems, improving performance, and adapting private sector expertise to Laboratory issues.

(ii) The term "systems" means any discrete process, procedure, program, document, or instrument where cost of use under this Contract can be identified and quantified to the parent corporation.

(iii) The Contractor, prior to using any parent corporate systems or home and branch office personnel, where reimbursement is expected, shall submit a plan to the Contracting Officer for review and approval. In reviewing the plan, the Contracting Officer will consider the extent to which each separate element of the plan is: more efficient in meeting mission and operational requirements; represents an overall cost savings to the Government; brings value-added expertise; assists the monitoring performance; and whether data is readily transferable to a successor Contractor.

(iv) The parent organization(s) shall establish an oversight entity, independent and autonomous from Laboratory management that shall ensure successful contract performance and that shall identify opportunities for the parent organization(s) to engage with Laboratory management to address Laboratory performance issues. The parent organization shall discuss Section J, Appendix A, Page 28 Contract No. 89233218CNA000001 oversight mechanism results and initiatives with senior NNSA leadership each quarter.

 (v) The parent organization(s) shall also establish an audit entity (e.g., audit committee), independent and autonomous from Laboratory management, that shall perform financial reporting, risk management, internal control, ethics, compliance with laws and regulations and the laboratory code of conduct, and the internal audit and external audit and review processes. The audit entity shall be established consistent with best practices identified by the Institute of Internal Auditors (IIA) and The Sarbanes Oxley Act of 2002, Section 301.

(vi) The audit entity shall provide the Contracting Officer with annual reports of its activities. On an annual basis the audit entity shall brief the Contracting Officer, or other delegate, as to its perspective on the: (1) Health of the Contractor's control environment; (2) Effectiveness of corrective action plans resulting from audit and review findings; (3) Significant financial and operational risk facing the organization; and (4) Adequacy of the Contractor's internal audit activity and staffing.

80.     The DOE regulations and Prime Contracts included several provisions for the payment of federal funds to the Prime Contractor as well as procedures for the credit or return of excess funds to the government.

81.     By way of example, Section I of the Prime Contracts provided for weekly submission of LANL payrolls by the Defendants (as provided by F.A.R. 52.222-8) and the required certification that the allowable charges are eligible, allowable, correct and complete. The Defendants thus submitted weekly

certifications and records to the government stating that allowable charges for work performed on LDRD and technology transfer activities was correct and complete.

82.     Also, by way of example, the Defendants were required by DEAR 970.5232-2, Payments and Advances, to verify the accuracy and completeness of all amounts billed to or paid by the government on an annual basis and to credit or repay any overcharges that may have occurred as the government advanced funds during the year based on the Prime Contractor's representations:

> (k) Review and approval of costs incurred. The contractor shall prepare and submit annually as of September 30, a "Statement of Costs Incurred and Claimed" (Cost Statement) for the total of net expenditures accrued (i.e., net costs incurred) for the period covered by the Cost Statement. The contractor shall certify the Cost Statement subject to the penalty provisions for unallowable costs as stated in sections 306(b) and (i) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 256), as amended. DOE, after audit and appropriate adjustment, will approve such Cost Statement. This approval by DOE will constitute an acknowledgment by DOE that the net costs incurred are allowable under the contract and that they have been recorded in the accounts maintained by the contractor in accordance with DOE accounting policies, but will not relieve the contractor of responsibility for DOE's assets in its care, for appropriate subsequent adjustments, or for errors later becoming known to DOE.

83.     The Defendants each agreed to safeguard the taxpayers' funds they had been entrusted with and ensure that they were expended only as provided for by the Prime Contract and the applicable regulations and statutes. To ensure compliance in these critical management and operation functions, the Defendants

represented to and assured the government that the Defendant Parent companies would establish independent audit operations to verify that the government's funds were not being misspent and the taxpayer was not being defrauded. **I-126 DEAR 970.5227-2 RIGHTS IN DATA-TECHNOLOGY TRANSFER (DEC 2000).**

84.     The Defendants, at all times during the relevant time period, knew: that all amounts billed or charged for LDRD and technology transfer related activities at LANL had to be recorded, billed and charged through accurate and contemporaneous entries of truthful information into the approved charges and billing system that would result in the charges billed to the government for the management and operation of LANL by the Prime Contractors, that the charges and billing system would inform  the government's decisions regarding payment, and that the information from the charges and billing system would cause the government's payment of federal funds appropriated by Congress to the Prime Contractor.

85.     The Defendants, at all times during the relevant time period, knew that all amounts billed or charged for, or relating to, specific LDRD and technology transfer activities at LANL had to be accurately coded and recorded so that the government would only pay for LDRD technology transfer activities

specifically allowed by and eligible under the Prime Contract and not prohibited by applicable law.

86.     In order for the Defendants to comply with the statutory requirements and prohibitions regarding expenditure of federal funds for LDRD and technology transfer, it was essential that they comply with the Prime Contract's requirements regarding timely and accurate billing and charges, as well as the auditing and other oversight required of, and promised by, the Defendant Parents.

## VI.   THE RELATOR'S BACKGROUND AND EXPOSURE TO THE DEFENDANTS' FRAUDULENT SCHEME

87.     In 2017 the Relator sought employment in northern New Mexico where his wife wished to be closer to family. The Relator was not licensed to practice law in New Mexico, and he opted to pursue employment outside of the practice of law.

88.     The nearby Los Alamos National Laboratory appeared to be the largest employer in Northern New Mexico, so the Relator applied with LANS, the Bechtel Prime Contractor Group subordinate entity, for a job in March 2017, where he was favorably considered for employment at LANL's Richard P. Feynman Center for Innovation, the main, but not only, Division focused on the Laboratory's innovation and technology transfer function mandated by federal statutes and the Prime Contract.

53

89.     The Richard C. Feynman Center for Innovation at LANL ("FCI") was responsible for arranging, identifying, monitoring, and evaluating technological, research and development activities at LANL, determining the respective interests in the intellectual property among private persons and entities and the United States, protecting and preserving the United States' interest in the intellectual property and facilitating the licensure of intellectual property to enable its use in the commercial marketplace where appropriate. The Relator's educational, military and professional background qualified him to work at LANL, particularly in the government contractor technology transfer function.  See DEAR 970.5227-3 Technology Transfer Mission. While the Congressionally mandated technology transfer mission was substantially performed by FCI, technology transfer activities were performed to varying degrees by many of the divisions of, and personnel employed at, LANL.

90.     The Relator's prior experience bears on his knowledge and understanding of the FCA violations described in this Complaint.  As a commissioned Army officer holding a Top-Secret clearance, Relator had served in a number of leadership and staff positions requiring engineering and technical knowledge, including, as a Reserve Judge Advocate General lawyer supporting the

Army Missile Command at Redstone Arsenal in Huntsville, Alabama. Examples of the Relator's pertinent military experience include:

    a.  Advising the Army Missile Command with respect to a $1 billion government contract as to transfer of intellectual property for reuse in connection with another contract.

    b.  Advising the United States Army about major end item procurement contracts, including as to intellectual property issues.

    c.  Negotiating government contracts for construction of forward bases in Armenia for deployment of U.S. military units.

    d.  Negotiating government construction contacts with an allied nation for deployment of missile defense sites.

    e.  Drafting and prosecuting patent applications for highly technical military equipment and technologies on behalf of the government.

    f.  Assisting one of the U.S. Army's research laboratories in performing its technology transfer requirements, identifying potential licensees, determining appropriate licensing values and determining awards for inventors based on potential value of the patents to the U.S. Army.

91.    After the Relator completed his military active duty, he gained experience as a lawyer heavily focused on intellectual property matters.  That

experience further qualified him for a non-lawyer operational position at LANL in the technology transfer area. Examples of that experience include:

a. Serving as in-house counsel for contractors working with the government on complex technical research and development programs where government rights and technology transfer in compliance with the applicable federal regulations was critical.

b. Drafting, implementing, and enforcing complex technology development and licensure agreements, including in connection with government programs.

c. Evaluating and implementing compliance with statutory and regulatory requirements for large government contractors in the intellectual property and technology transfer area.

d. Developing and implementing large national and international technology development and licensure functions for private corporations.

e. Managing complex intellectual property litigation.

f. Negotiating technology license agreements with and for major corporations.

g. Contracting with and for government agencies.

h.  Reviewing intellectual property portfolios for the acquisition of the portfolio and/or the company.

92.    The Relator was hired by LANS in July 2017, as a technology transfer professional in a strictly operational, expressly non-lawyer capacity.

93.    As part of the on-boarding process at LANL, the Relator was introduced to Mr. A, the Division Leader with overall managerial responsibility for the LANL technology transfer function, including serving as the FCI Division Leader. Mr. A advised the Relator that he was impressed with his background and happy that he had decided to work at LANL.

94.    On or before August 24, 2017, Mr. A asked the Relator to assist him in reviewing the Division's overall technology transfer operational performance and help identify deficiencies with its performance.  Mr. A advised the Relator that such a review was particularly important because the NNSA and DOE had decided to change the Prime Contractor, and he was anticipating a transition of the management and operation of LANL upon the entry of a new Prime Contract. The Relator carefully studied the existing Prime Contract, Amendments, and related documents.  The Relator also began to attend weekly Friday meetings with Mr. A to discuss his findings.

95.     The Relator eventually uncovered evidence that the Bechtel Prime Contractor Group operating Defendant LANS was engaged in wholesale corruption of their "technology transfer" obligations and other duties under the Prime Contract.  In particular, the Bechtel Prime Contractor Group Defendants:

a.  Treated millions of dollars in technology transfer charges as essentially a "slush fund" to enrich Defendants.

b.  Directed employees to make false statements in billing records to justify and conceal wholesale fraudulent billings.

c.  Corruptly misrepresented that the Defendant Prime Contractors and the other Defendants honestly performed their oversight and auditing obligations under the Prime Contracts, when instead the "auditing" both permitted and concealed a fraudulent business model; and

d.  Intentionally misrepresented to the government and concealed, for their own financial benefit, the existence and status of the government's intellectual property developed at a cost of hundreds of millions of dollars, in a manner calculated to defeat the government's policy objectives of innovation and technology transfer and the commercialization of intellectual property.

96.     To illustrate how the Relator learned of this corruption, initially in carrying out Mr. A's instructions, the Relator soon discovered that there were numerous and substantial operational deficiencies that materially and negatively impacted the technology transfer function at LANL. By way of example, when Relator inquired, no one employed at LANL could even determine the current number of technology transfer licenses LANL had in existence. Nor could any employee provide reasonable support, documentary or otherwise, to justify LANS' ongoing representations to the government about the number of such licenses that LANS was charging the government to manage.

97.     The Relator determined that, contrary to the obligations imposed by the Prime Contract, FCI had licensed few of its copyrights since LANS became the Prime Contractor in or before 2006.  This startling discovery showed that the Bechtel Prime Contractor Group Defendants had deliberately worked to defeat the important public policies embodied in the Prime Contracts—that intellectual property developed at taxpayer expense be "commercialized," as required by federal statutes dating back to 1980.  *See, e.g.,* Stevenson-Wydler Technology Innovation Act of 1980, as amended (15 U.S.C. 3710a).  Instead, the Bechtel Prime Contractor Group Defendants violated this core obligation relating to intellectual property in order to enrich themselves at taxpayer expense.

59

98.     The Relator also determined that the Bechtel Prime Contractor Group Defendants' management chose not only to violate (by largely ignoring) the technology transfer obligations of the Prime Contracts, but also to account *dishonestly* for wholesale unallowable costs charged to technology transfer, in order to (1) enrich themselves further and (2) reduce the likelihood of audits that would uncover their corruption.  The Prime Contracts, following applicable law, defined various costs that Defendants might incur as ineligible or unallowable and thus as costs that should be borne by Defendants, not by the taxpayers.  Defendants routinely and corruptly instructed employees to charge various unallowable costs to technology transfer, and to other improper categories.

99.     Sometimes the unallowable costs charged amounted to obvious theft and conversion of taxpayer funds.  Examples include Defendants' hiring family members of management as "technology transfer" personnel, when those family members lacked any background in technology transfer. Again, Defendants largely ignored their technology transfer obligations, and instead used that description to disguise payments to benefit themselves at taxpayer expense.

100.   In addition, Defendants instructed employees such as Relator to charge all of their time to technology transfer, when in fact that charge was fraudulent for many charges under the Prime Contracts.  On or about August 2,

2017 (Relator's first week at LANL), the acting deputy division leader instructed Relator to bill only to the allowable charge billing code for technology transfer, FCI-DO.  The Relator later discovered that the use of such a general technology transfer billing code resulted in allowable and unallowable or potentially unallowable charges being comingled in a manner that made all of the charges to deceptively appear to be allowable and eligible, and thus payable by the government.  The Bechtel Prime Contractor Group Defendants thus caused multiple false statements and records to be made and used to get false claims paid under the Prime Contracts in this way.

101.   The Bechtel Prime Contractor Group Defendants also instructed the Relator to inaccurately enter his hours for work billed, in ways that appeared to be deceptive. When the Relator protested, two members of LANL management advised the Relator that LANS employees were required to log their time in this inaccurate fashion to conceal information that would otherwise cause an audit to be initiated.

102.   The experience described above alerted the Relator to three important facts:

      a.   The Relator's intermediate supervisors, as well as the FCI Division Leader, Mr. A, had confirmed that LANS employees were

systemically required by LANS, a government contractor, to falsely

enter their records of time paid for by the government for the express

purpose of avoiding audits that would otherwise reveal truthful

information about time worked.

b. The two supervisors, who were members of the Bechtel Prime

Contractor Group management, were unhappy that the Relator was

meeting with the Division Leader regarding of the Bechtel Prime

Contractor Group's management of the LANL technology transfer

function.

c. The two supervisors did not appear to believe that Mr. A could or

would do anything to disrupt the requirement that LANS employees,

including the Relator, falsely bill their time, at least under the

circumstances presented.

103.   Following the above-described incident, the Relator continued his

Friday meetings with Mr. A regarding operational deficiencies that needed to be

addressed in advance of the transition to a new Prime Contractor. During this time,

the Relator learned that, historically, employees--including management--of

departing Prime Contractors at LANL would become employed by the incoming

Prime Contractor and would usually continue in their existing positions. While Mr.

A indicated that he did not want anything to disrupt the orderly transition process that would result in employees and management keeping their jobs, he also appeared interested then in identifying deficiencies before the transition.

104.   Mr. A's stated primary concern was the identification and inventory of all intellectual property and licenses at LANL, as this would be critical to the Prime Contractor transition process. The voluminous IP items in question were valuable government property that LANS had been paid well to develop, identify, inventory, safeguard and, where appropriate, facilitate transfer to the commercial marketplace. As Division Leader of the Feynman Center, Mr. A was responsible for overseeing a transparent and orderly turnover of the government's valuable intellectual property to the new Prime Contractor who would then undertake stewardship of it and other assets.

105.   It soon became clear to the Relator that the systemic deficiencies that had festered at LANL during of the Bechtel Prime Contractor Group's watch would cause the task of identifying and properly accounting for the government's IP to be Herculean, if not impossible.  The Relator decided to redouble his efforts to discover and understand the deficiencies and search for ways to correct them so that the transition task could be completed with the requisite candor and integrity

required of a trusted government contractor such as of the Bechtel Prime

Contractor Group.

106.    In February 2018, Mr. A was replaced as head of FCI by  another

long-time LANS manager ("Mr. B").  Initially, under Mr. B.'s leadership, the

Relator continued his efforts to identify and correct the deficiencies he had

identified at LANL and to make full reports to Mr. B.

107.    Quickly after Mr. B was put in charge, things began to change.  Mr. B

demoted the Relator, required that the Relator stop working on the tasks that Mr. A

had assigned and placed him under the supervision of Ms. C.

108.    The Relator continued to voice his concerns about the deficiencies he

had discovered to management and, consequently, was ultimately terminated by

Mr. B on July 25, 2018. Under the circumstances, the Relator viewed his

termination as strong evidence that the billing irregularities and other deficiencies

he had discovered at LANL resulted from a fraudulent scheme perpetrated at the

direction of senior management of the Bechtel Prime Contractor Group, including,

but not limited to, Mr. B.

109.    Following his termination, the Relator continued to develop

information and review the billing irregularities and other deficiencies he had

witnessed.

## VII.   THE DEFENDANTS' FRAUDULENT SCHEME.

110.   The Relator's information demonstrated that:

a.   Management personnel, put in place at LANL by the Bechtel Prime Contractor Group, were systemically directing and requiring employees to prepare and submit billing records that falsely represented that the charges were for allowable technology transfer activities when, in truth and fact, the work was for unallowable maintenance of copyrighted data activities or other unallowable charges for which payment from government funds was not authorized.

b.   Management personnel, put in place at LANL by the Bechtel Prime Contractor Group, were systemically directing and requiring employees to prepare and submit billing records that falsely represented that the charges were for allowable work on specific programs funded by the government when, in truth and fact, the work was for unallowable copyright maintenance activities or other unallowable charges for which payment from government funds was not authorized.

c.  Management personnel, put in place at LANL by the Bechtel Prime
    Contractor Group, were systemically directing and requiring
    employees to prepare and submit billing records that falsely
    represented that the charges were properly billed to allowable
    overhead or administration accounts to be paid from government
    funds when, in truth and fact, the work was for unallowable copyright
    maintenance activities or other unallowable charges for which
    payment from government funds was not authorized.

d.  Management personnel, put in place at LANL by the Bechtel Prime
    Contractor Group, were systemically directing and requiring
    employees to prepare and submit records and statements that falsely
    represented that ownership of specific items of government owned
    intellectual property should be transferred to the Prime Contractor so
    that it could take action to commercialize the intellectual property and
    otherwise facilitate its transfer to the commercial marketplace when,
    in truth and fact, the Bechtel Prime Contractor Group knew that it had
    no such plan or intent to commercialize the technology, and that the
    deceptive request was made to increase the amount of government
    funds paid to the Bechtel Prime Contractor Group.

66

e.  Management personnel, put in place at LANL by the Bechtel Prime Contractor Group, were systemically directing and requiring employees to prepare and submit records and statements that falsely represented that ownership of specific items of intellectual property originally paid for by the government should remain with the Prime Contractor so that it could continue to take action to commercialize the intellectual property and otherwise facilitate its transfer to the commercial marketplace when, in truth and fact, the Bechtel Prime Contractor Group knew that it had no such plan or intent to commercialize the technology, and that the deceptive request was made to increase the amount of government funds paid to the Bechtel Prime Contractor Group.

f.  Management personnel, put in place at LANL by the Bechtel Prime Contractor Group, were systemically directing and requiring employees to falsely and fraudulently conceal from, and fail to disclose to, the government that the Prime Contractor, in truth and fact, had no future plan or intent to commercialize specific items of intellectual property originally paid for by the government even though the Prime Contractor was required by the Prime Contract  to

truthfully inform the government if it did not intend or plan to commercialize the property and thus to enable transfer of ownership back to the government.

g.  Management personnel, put in place at LANL by the Bechtel Prime Contractor Group, were systemically directing and requiring employees to prepare and submit records and statements that falsely represented that the Prime Contractor had completed certain required tasks that were required conditions that had to be met prior to the transfer of ownership to the Prime Contractor for commercialization of specific items of intellectual property originally paid for by the government when, in truth and fact, the Bechtel Prime Contractor Group knew that the required conditions had not been met.  Examples of those unmet conditions include providing to a government repository an abstract, source code, object code, and support documentation.  DEAR § 970.5227-2(e).

h.  Management personnel, put in place at LANL by the Bechtel Prime Contractor Group, were systemically, falsely, and fraudulently expanding the personnel, buildings and other resources purportedly devoted to technology transfer activities at LANL when, in truth and

68

fact, they knew that the amount of actual legitimate work devoted to technology transfer activities was minuscule in comparison to the amount represented to the government as justification for the expansion of resources.

i. Management personnel, put in place at LANL by the Bechtel Prime Contractor Group, were systemically permitting, directing, and requiring employees to bill the government for unallowable charges by falsely and fraudulently representing that they were for allowable items payable by the government.

j. Management personnel, put in place at LANL by the Bechtel Prime Contractor Group, were systemically directing and requiring employees to prepare and submit billing records that falsely represented that the charges were properly billed to allowable program, overhead or other accounts for which expenditure of government funds was allowable in order to conceal that the charges were, in truth and fact, attributable to technology transfer activities and were being deceptively submitted in order to fraudulently conceal that the Prime Contractor had exceeded the "One Half of One Percent Limitation" and that the excess charges were to be paid by the Bechtel

Prime Contractor Group from its funds and were not eligible and
authorized charges that could lawfully be paid by the government.

k.  The Bechtel Prime Contractor Group was systemically, falsely, and
fraudulently representing to the government that it was conducting the
promised oversight and independent audit of the management and
operation of LANL by the Prime Contractor when, in truth and fact, it
was conducting no such meaningful oversight or audit of the activities
alleged herein and was, instead, facilitating the perpetuation of the
fraudulent scheme.

l.  Upon taking over as Prime Contractor responsible for the
management and operation of LANL in November 2018, the
management personnel of the Battelle Prime Contractor Group failed
to disclose to the government the existence of the fraudulent scheme
alleged herein, but instead, retained Mr. B in his senior management
position and allowed management, acting on behalf of the Battelle
Prime Contractor Group, to continue to perpetuate the fraudulent
scheme. Since the transition to the Battelle Prime Contractor Group,
the Relator has continued to develop information. During this time,
the Relator has learned that the false and fraudulent scheme described

herein has continued under the Battelle Prime Contractor Group; that when Mr. B transitioned from his management position, he was replaced by his collaborator Ms. C, and that the Battelle Prime Contractor Group has provided no meaningful oversight or auditing which, if honestly provided as represented to the government, would have stopped the fraudulent scheme.

m. Since taking over as the LANL Prime Contractor, the Battelle Prime Contractor Group has knowingly failed to complete technology transfer, innovation and commercialization activities in accordance with its arrangements with commercial entities and individuals doing business with LANL, including, but not limited to,  failing to properly disclose and patent innovations subsequently licensed to Chevron and falsely representing that commercialization activities were being conducted in the case of Alta, and, upon learning of the failures, Battelle Prime Contractor Group senior management has attempted to conceal and obfuscate them rather than disclose and correct them.

111.   The Defendants' fraudulent scheme was perpetuated, in significant part, by the Defendants' knowing entry of false and fraudulent records into LANL's billing system that, but for the Defendants' fraud scheme, would have

enabled the Prime Contractor and the government to distinguish allowable charges, lawfully payable by the government, from unallowable charges that were the responsibility of the Prime Contractor.

112.   The system for billing and charges pursuant to the Prime Contract at LANL included a data entry system provided by the Oracle Corporation. If utilized accurately and appropriately the Oracle data entry system fed into the Oracle "Costs View" system, which enabled management to verify that billing and charges under descriptive codes would facilitate accurate and timely billing of charges and would:

    a.  Segregate ineligible or unallowable charges not payable by the government from eligible and allowable charges that were payable by the government.

    b.  Clearly and candidly identify unallowable charges that, although not payable by the government, might arise from activities that the Prime Contractor opted to engage in for its own benefit, whether or not the unallowable charge resulted in some or no benefit to the government.

    c.  Clearly and candidly identify otherwise allowable charges for technology transfer activities that would be subject to the One Half of One Percent Limitation.

d.  Clearly and candidly identify charges for maintenance of copyrighted data that would be deemed unallowable under applicable law and the terms of the Prime Contract.

e.  Clearly and candidly identify charges for maintenance of copyrighted data that the Prime Contractor truthfully and in good faith believed necessary and appropriate to meet DOE Program needs, as determined by the Contract Officer or other authorized DOE personnel, that would alert responsible government officials that the charge was being presented as one necessary and appropriate to meet DOE Program needs, thus enabling review so that government officials could make informed decisions.

f.  Clearly and candidly identify charges for maintenance of copyrighted data for which the Prime Contractor had received, or intended to seek, the informed written approval by the contracting officer.

g.  Clearly and candidly identify charges for maintenance of copyrighted data that were not allowable charges to be paid for from government funds, but could be paid for from net royalty income to the extent earned by the Prime Contractor.

113.   Rather than honestly use the Costs View system, and other billing resources, to truthfully inform the government and support and facilitate only the payment of eligible and allowable charges from government funds, the Defendants knowingly rigged the system to deceive the government and cause it to pay for ineligible and unallowable charges and pay more for research and development and technology transfer than permitted by the Prime Contracts and applicable law.

114.   At the direction of management, LANS and Triad employees routinely and knowingly charged maintenance of copyrighted data work, costs, and expenses to general technology transfer codes with the designator "FCI-DO," to other specific government programs' funds restricted for the programs, to overhead, administration and other direct and indirect accounts and codes that were not to be used for unallowable charges;  instead of to a specific copyright maintenance code that, as required by the Prime Contract and applicable law, would segregate unallowable charges for maintenance of copyrighted data from allowable charges so that the government would not be billed for unallowable charges.

115.   The Relator observed that employees were carefully trained by the Bechtel Prime Contractor Group management on how to enter their time and other

charges into the LANL billing system and were required and directed to use specific billing codes supplied by management.

116. The Relator further observed that management would systemically and continuously direct FCI employees, including the Relator, to bill unallowable charges for maintenance of copyrighted data activities to the FCI-DO codes for allowable technology transfer activities. This was one of the deficiencies that the Relator informed management about and that management refused to correct or otherwise address.

117. The Relator's continued inquiries following his termination, led to his review of substantial Costs View data for the years 2014 through 2019, encompassing  the tenure of both the Bechtel and the Battelle Prime Contractor Groups. As demonstrated by the Relator's observations and the Costs View data, the Bechtel and the Battelle Prime Contractor Groups should have directed employees to truthfully bill charges for unallowable maintenance of copyrighted data to other codes that would candidly reveal their unallowable status, or contested status if applicable, yet the Bechtel and the Battelle Prime Contractor Groups instead directed FCI employees to falsely and fraudulently charge the allowable FCI-DO codes.

118.   Management employees at every level of leadership were required to review all charges by employees and were responsible for ensuring their accuracy; however, in the case of charges for unallowable maintenance of copyrighted data, managers enabled, facilitated, encouraged and required employees to deceptively charge their copyright maintenance related work so that it would be paid for by the government, when the government should not have been charged for it.

119.   Notwithstanding management's obligation to ensure that work was accurately billed, FCI managers, including but not limited to, FCI division leaders, including Mr. A and Mr. B, knowingly certified the false and fraudulent charges for maintenance of copyrighted data so that they would be included in the charges routinely billed to the government for payment.

120.   On a weekly basis, the Prime Contractors submitted false charges for copyright maintenance to the government and drew down on government funds for payroll and other expenses in amounts greater than they should have been, but for the false charges for unallowable copyright maintenance.

121.   The Relator directly observed that services performed, and costs incurred by LANL employees, including but not limited to the Relator, several others working at the Feynman Center, and in house counsel providing services

relating to the technology transfer function, were continuously billed to codes that concealed the fact that the work was for maintenance of copyrighted data.

122.   In addition to the false and fraudulent charges for maintenance of copyrighted data submitted by FCI employees, other LANS and Triad employees working in other LANL divisions, including principal investigators, were also permitted and required to submit charges for maintenance of copyrighted data under other billing codes that concealed the fact that the charges were for unallowable maintenance of copyrighted data.

123.   Such deceptive charges for work performed by non-FCI employees at LANL for unallowable maintenance of copyrighted data were submitted throughout the relevant time period including, but not limited to, through deceptively coding the charges as being billable to specific programs funded by the government, when such charges were not allowable with respect to the programs; or by billing the charges generally to administration or overhead.

124.   False and fraudulent charges for unallowable maintenance of copyrighted data by non-FCI employees included, but were not limited to:

     a.   Charges relating to scientific and technical papers that non-FCI employees wished to have published.

   b.   Charges relating to computer code written by non-FCI employees that FCI management opted to include in copyrighted material being maintained by FCI and in support of which FCI needed the non-FCI employee who wrote the code to create additional documentation.

 125.   The unallowable charges for maintenance of copyrighted data alleged herein were unallowable because they were primarily for the benefit of the Prime Contractor and the written authorization of the contracting officer was not sought or obtained, but instead, the true nature of the charges as being for maintenance of copyrighted data was deceptively concealed. Defendants' acts and false statements were knowingly false and fraudulent, because LANS and Triad each falsely billed the charges under allowable codes, failed to bill the charges truthfully under a maintenance of copyrighted data code, failed to correct these false and fraudulent billings through their independent audit obligations, and failed to otherwise candidly inform the government of the true nature of the charges.

 126.   In addition, with respect to the vast majority of the items for which copyrights were asserted, LANS and Triad failed to make good faith efforts to commercialize the copyrighted material, and instead falsely and fraudulently concealed this fact from the government by making and submitting false and fraudulent representations, statements and documents:

a.  When initially requesting the right to assert copyrights for the benefit of the prime contractor, by falsely and fraudulently representing that they intended to exercise good faith efforts and reasonable diligence to commercialize the copyrighted material, and that they had performed the necessary prerequisites to commercialize the copyrighted material.

b.  When providing the required reports to the government after five years of copyright assertion, by falsely and fraudulently representing a continued intent to commercialize the copyrighted material.

c.  By deceptively failing to comply with their express obligation to inform the government of their abandonment of commercialization efforts, which constituted abandonment of the technology transfer mission that is an important public policy embodied in the statutes, regulations, and contract provisions quoted above.

127.   In other ways as well, LANL management further concealed charges to the government for technology transfer activities by billing work done on technology transfer related programs to non-technology transfer program billing codes.

128.   One such example was the TUVA program at LANL.   The TUVA program involved the modification of a proprietary computer program that had been developed by Clarivate, for which a primary purpose of the modified program was to assist in the management of technology transfer activities at LANL generally, and the copyright maintenance function specifically. LANL management directed and required that charges for work on the TUVA program be falsely and fraudulently billed to non-technology transfer billing codes, such as a code relating to the Directors Fund, in order to fraudulently conceal from the government that the charges should be subject to the One Half of One Percent Limitation.

129.   The government was charged in excess of $10 million for work on the TUVA program at LANL.

130.   In addition to the false and fraudulent charges for the TUVA program, LANL management, throughout the relevant time period, knowingly, continuously and systemically directed and required that other charges for work and costs relating to technology transfer activities be falsely and fraudulently billed to non-technology transfer related programs and billing codes, including, not limited to, the following examples:

a.   Charges for IT equipment.

80

b.  Charges for cell phones, including, but  not limited to after actual usage of such phone equipment had been terminated.

c.  Charges for rent and other usage of LANL facilities for technology transfer activities.

131.  Throughout the relevant time period, LANL management also directed and required that other unallowable charges, which were required to be borne by the Prime Contractor at no cost to the government, be falsely and fraudulently billed to technology transfer related billing codes for allowable charges. Examples of such charges include, but are not limited to, the following:

a.  Charges for LANL employee travel expenses, for promotional activities benefiting the Prime Contractor, that were unallowable charges to the government.

b.  Charges falsely and fraudulently represented to be for employees working at FCI and needing work related items such as cell phones, computer software programs, computers and other goods and services, when in truth and fact the "employee" was not currently working at FCI.

c. False and fraudulent charges for compensation of family members of employees who were employed for the purpose of circumventing salary limitations.

d. False and fraudulent charges to technology transfer related billing codes when, in truth and fact, the work was done in connection with a CRADA, whereby all work was required to be billed to the specific CRADA account, and any deficit between the revenue generated and the cost incurred with respect the CRADA was to be borne by the Prime Contractor.

e. False and fraudulent charges for technical reports and other technical work that went unperformed, but that were deceptively charged by employing high school students and falsely and fraudulently representing that they were preparing complex technical documentation when, in truth and fact, they were not and could not.

f. False and fraudulent payments to third-party individuals and organizations, deceptively represented to be for technology transfer activities, when in truth and fact the payments included a kickback to induce a third party to provide donations that were falsely and fraudulently characterized as "sponsorships" used to pay for otherwise

unallowable charges for which the government did not intend to pay and for which the government had prohibited the Prime Contractor from billing the government.

g.  Falsely and fraudulently representing that certain work, costs or expenses were for allowable items, when LANL management knew they were unallowable and, if incurred, had to be at sole expense of the Prime Contractor.

h.  Charges billed to weapons activities for Laboratory Directed Research and Development and technology transfer not in support of DOE's national security mission.

i.  Charges billed to defense environmental cleanup activities for Laboratory Directed Research and Development and technology transfer not in support of DOE's defense environmental cleanup mission.

132.  Through their fraudulent scheme, from in or before July, 2006 and continuing to date (the "relevant time period"), the Bechtel and Battelle Prime Contractor Groups Defendants continuously, systemically, and collaboratively violated the False Claims Act in their management and operation of LANL pursuant to their respective Prime Contracts by submitting false and fraudulent

claims for work, costs and expenses associated with the technology transfer function.

133.   The statutes, regulations, and contract provisions described above were expressly applicable to the Prime Contracts and provided for limitations on the use of funds for technology transfer activities conducted pursuant to the Prime Contracts.

134.   As described above, from in or before July 2006 through November 2018, LANS managed and operated LANL under the LANS Prime Contract and perpetuated the fraudulent scheme alleged herein.  The "parents" of LANS were also responsible and liable as they had independent obligations to conduct independent oversight and audits of LANL, but through knowledge or reckless disregard of the truth helped facilitate the fraudulent  scheme by allowing the audits to be used to conceal the scheme.  The Defendant Parents are also liable as guarantors of performance of the Prime Contractor.

135.   As described above, from November 2018 to date, Triad has operated under the Triad Prime Contract and perpetuated the fraudulent scheme alleged herein.  The "parents" of Triad were also responsible and liable for the fraudulent scheme as they had independent obligations to conduct independent audits of LANL, but through knowledge or reckless disregard of the truth helped facilitate

the fraudulent scheme by allowing the audits to be used to conceal the scheme. Separately and independently, the Defendant Parents are liable as guarantors of performance of the Prime Contractor.

136.   Triad employed substantially the same employees, including the management employees, who had perpetuated the fraudulent scheme when previously employed by LANS.  Triad had knowledge of the fraudulent scheme perpetuated by LANS and knowingly continued to perpetuate the fraudulent scheme and failed to disclose it to the government.

137.   The management employees initially employed by LANS and then employed by Triad included, but were not limited to, Mr. B and Ms.  C, whose identities have been disclosed to the government by Relator.

138.   As alleged above, the Defendant Parents of the Bechtel Prime Contractor Group and the Battelle Prime Contractor Group each represented to the government that they would use their resources and expertise to supervise and independently audit the performance of their respective Prime Contractor entities and would, therefore, protect the government against, and inform the government of, misconduct such as that encompassed by the fraudulent scheme.

139.   Each and every representation by the Defendant Parents that they would exercise oversight, supervise, audit and assure performance of their

respective Prime Contractor entities were knowingly false and fraudulent and were intended to cause the government to pay their respective Prime Contractor entities amounts to which they were not entitled pursuant to the Prime Contracts.

140.   Defendant's LANS and Triad, as well as the Defendant Parents Bechtel and Battelle, had an ongoing duty to inform the government of, and protect the government against, prior False Claims Act violations committed in the perpetuation of the fraudulent scheme.

141.   The Defendants perpetuated the fraudulent scheme through a number of false and fraudulent activities as alleged herein.

142.   The Defendant Parents persuaded the NNSA to select their respective LLC – Prime Contractors to manage and operate LANL based upon their representation that they would devote their substantial resources and expertise, including, but not limited to, in the form of management personnel to the management and operation of LANL and would further provide ongoing audit and oversight of the Prime Contractors' actions.

143.   Each of the Defendants had a duty and responsibility to ensure that charges billed to the government were allowable under the applicable law and the Prime Contracts.

144.   Each of the Defendants had a duty and responsibility to the government to discover and immediately halt and correct the false and fraudulent charges, and other actions, alleged herein, to promptly report them to the government and to accurately calculate all resulting overcharges and refund them to the government.

145.   Instead of stopping and correcting the false and fraudulent conduct alleged herein, reporting it to the government and properly refunding the resulting overcharges, the Defendants caused and permitted the Prime Contractor's false and fraudulent activities, as alleged herein, to be substantially expanded in scope and increased in amounts including, but not limited to:

   a.   The Prime Contractors continuously expanded the number of items of intellectual property, including asserted copyrights, and developed a huge and unnecessary inventory of intellectual property to deceptively justify ongoing management and maintenance and an ever-expanding staff and resources purportedly devoted to these primarily unnecessary and excessive  functions.

   b.   Senior management at LANL permitted and directed both FCI employees and non-FCI employees at LANL to make continuous false and fraudulent representations to the government that FCI intended to

commercialize intellectual property, including copyrightable material, in order to persuade the government to permit FCI to assert copyrights in favor of the prime Contractors when, in truth and fact, the Defendants knew that they were not taking even basic steps required for commercialization, and would typically not commercialize the intellectual property.

c.  Senior management at LANL permitted and directed both FCI employees and non-FCI employees at LANL to make continuous false and fraudulent representations to the government that FCI still intended to commercialize intellectual property, including copyrightable material, in order to persuade the government to continue to permit FCI to assert copyrights in favor of the Prime Contractors in excess of five years when, in truth and fact, the Defendants knew that they would likely not commercialize the intellectual property.

d.  Senior management at LANL permitted and directed both FCI employees and non-FCI employees at LANL to continuously falsely and fraudulently conceal from the government the fact that FCI had no good faith intention to commercialize intellectual property,

88

including copyrightable material, and that Defendants had abandoned any such efforts; the Defendants had a duty and obligation to truthfully inform the government regarding their lack of efforts and plans (including abandonment of such efforts) to commercialize the intellectual property, and were obligated to return it to the government free of any assertions of right by the Prime Contractor.

e. Senior management at LANL permitted and directed both FCI employees and non-FCI employees at LANL to continuously falsely and fraudulently represent to the government that all tasks required as a prerequisite to the Prime Contractors' assertion of copyrights with respect to government owned intellectual property had been performed when, in truth and fact, since tasks were either not substantially performed or not completed; including but not limited to, preparation and delivery of object code, source code, manuals and other documentation.

f. Senior management at LANL permitted and directed both FCI employees and non-FCI employees at LANL to continuously falsely and fraudulently failed to identify and disclose to the government the

existence of intellectual property created through government programs.

146. Senior management at LANL thus enabled, facilitated, permitted and directed this systemic, continuing fraudulent scheme at LANL, whereby the technology transfer function was subverted in order to:

a. Submit false and fraudulent claims for payment by the government for technology transfer activities that were substantially in excess of the One Half of One Percent Limitation.

b. Submit false and fraudulent claims for payment by the government for high volumes of unnecessary and useless activities that Defendants falsely and fraudulently represented to be in support of the technology transfer commercialization function, but when in truth and fact, senior management at LANL knew that the purported activities billed for useless "make work" designed to expand the size and scope of the purported technology transfer operation of LANL in order to enable the Prime Contractors to cause the government to pay them more than they were entitled to, and to evade crediting and refunding amounts to the government to which the Prime Contractors were not entitled.

c. Submit false and fraudulent claims for payment by the government for unallowable maintenance of copyrighted data and related work.

d. Submit false and fraudulent requests to the government, and create false supporting records and statements, to persuade the government to allow the Prime Contractors to exercise ownership and control rights over government intellectual property, to continue to exercise those ownership and control rights and to deprive the government of those ownership and control rights and the subject intellectual property.

e. Submit false and fraudulent claims for payments for Laboratory Directed Research and Development and technology transfer activities from funds appropriated for other programs and activities.

## VIII.  SPECIFIC FALSE CLAIMS ACT VIOLATIONS RESULTING FROM THE FRAUDULENT SCHEME

147.  The Defendants' actions constituted material violations of the federal False Claims Act, as set forth at 31 USC § 3729(a) (A), (B), (D) and (E), that caused substantial damages to the United States.

148.  In violation of 31 USC § 3729(a) (1) (A), Defendants LANS and Triad each knowingly presented, or caused to be presented, false or fraudulent

claims for payment or approval to the United States, in their capacity as Prime

Contractors managing and operating LANL, including, but not limited to:

a. The Defendants' weekly certifications and payment requests,

   presented to the government pursuant to FAR 52.222-8 and the

   Prime Contracts for approval and payment of payroll, which

   included false or fraudulent claims for the charges alleged herein.

b. Each and every projection, budget or estimate of costs and charges

   for the management and operation of LANL that encompassed the

   false or fraudulent claims for the charges alleged herein.

c.  Each and every report, certification and confirmation of the of

   costs and charges for the management and operation of LANL,

   including, but not limited to, end of year and end of contract

   transition reports, that encompassed the false or fraudulent claims

   for the charges alleged herein.

d. Each and every certification, report or draw against the allocated

   $1 million amount for certain technology commercialization set

   forth in the Prime Contract (Appendix N) for work not actually

   performed by personnel including senior managers Mr. A and Mr.

   B, which was intended to absorb the $1 million Appendix N

budget without actually performing the activities required thereunder.

e. Each and every entry into the Oracle billing system that concealed charges for maintenance of copyrighted data, concealed charges for technology transfer or caused unauthorized charges for technology transfer to be included in overhead, administration or other pools or accounts.

f. Each and every request for copyright assertion, continuation of copyright assertion or continued use, control or ownership of intellectual property protectable by copyright when the Defendants had no intent or plan to commercialize the intellectual property.

g. Each and every request for bonus, incentive or other payments based upon performance relating to the items of intellectual property the Defendants represented that they were attempting to commercialize.

h. Each and every direct and indirect charge for LDRD or technology transfer that resulted in a payment from funds appropriated for other programs of projects, including, but not necessarily limited to, weapons activities, when not in support of the DOE national

security mission, or defense environmental cleanup, when not in

support of the DOE defense environmental cleanup mission.

149.   As alleged herein, the specified claims knowingly submitted by

Defendants LANS and Triad were false or fraudulent for reasons including, but not

limited to:

    a.   As Prime Contractors, Defendants were compensated pursuant to

       formulas set forth in the Prime Contracts that included direct

       relationships between the amounts paid to and retained by LANS and

       Triad and the representations made by about the amount of time,

       costs, and expenses billed to specific functions, programs, and

       projects that were eligible and allowable under the Prime Contracts.

    b.   As alleged herein, Defendants managed and operated LANL in a

       manner that included ongoing, pervasive, and systemic false or

       fraudulent representations in charges, billing, reports and other

       documents and records that were expressly false or intentionally

       lacking truthful disclosures that caused the billing, reports and other

       documents to be false and misleading.

    c.   Such false or fraudulent representations included, but were not limited

       to, the general representation that Defendants LANS and Triad

managed and operated LANL in compliance with the research and development and technology transfer requirements of the Prime Contracts and applicable federal statutes and regulations when, in truth and fact, Defendants LANS and Triad knew that this representation was false.

150.   Defendants knowingly presented, or caused to be presented, the false or fraudulent claims for payment or approval, as the term "knowingly" is defined at 31 USC § 3729 (b) (1), because Defendants LANS and Triad had "actual knowledge of the information," acted "in deliberate ignorance of the truth or falsity of the information," or acted "in reckless disregard of the truth or falsity of the information."

151.   In violation of 31 USC § 3729(a) (1)(B), Defendants each knowingly made, used, or caused to be made or used, false records and statements material to false or fraudulent claims, including, but not limited to the records and statements alleged above.

152.   Each of the false records and statements were "material" as that term is defined at 31 USC § 3729(b) (4) in that they had a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

153.   In violation of 31 USC § 3729(a) (1)(C), Defendants each conspired to commit violations of 31 USC § 3729(a) (1) (A), (B), (D), (E) and (G), including, but not limited to, as follows:

    a.   The Bechtel Prime Contractor Group and each of its members initiated the fraudulent scheme alleged herein, including through the actions of Mr. B.

    b.   In or about November 2018, Mr. B left the employment of the Bechtel Prime Contractor Group and became employed by the Battelle Prime Contractor Group.

    c.   The Battelle Prime Contractor Group had knowledge of the fraudulent scheme perpetuated by the Bechtel Prime Contractor Group, including, but not limited to, through the knowledge of the Battelle Prime Contractor Group managerial employee, Mr. B.

    d.   The Battelle Prime Contractor Group and each of its members had a duty to inform the government of the fraudulent scheme commenced by the Bechtel Prime Contractor Group, but instead elected to join in and conceal the fraudulent scheme from the government.

    e.   The Battelle Prime Contractor Group and the Bechtel Prime Contractor Group, and each of their respective members, have thus

knowingly conspired and acted in concert with each other to perpetuate and continue the False Claims Act violations alleged herein.

154.   In violation of 31 USC § 3729 (a) (1)(D), the Defendants each had possession, custody, or control of property or money used, or to be used, by the government and knowingly delivered, or caused to be delivered, less than all of that money or property to the government, including, but not limited to, as follows:

   a.   By failing to disclose the false and fraudulent charges alleged herein, the Defendants retained overcharges that, under the Prime Contracts and applicable regulations, they were required to credit back to the government.

   b.   By failing to disclose the false and fraudulent charges assertion and retention of copyrights alleged herein, the Defendants retained items of intellectual property that, under the Prime Contracts and applicable regulations, they were required to return to the government.

155.   In violation of 31 USC § 3729(a) (1)(E), the Defendants were each authorized to make or deliver documents certifying receipt of property used, or to be used, by the government and, intending to defraud the government, made or

delivered the receipt without completely knowing that the information on the receipt is true, including, but not limited to, as follows:

a. The Defendants were required to calculate and credit back to the government the overcharges alleged herein at least annually and to disclose the overcharges on reports, certifications or other documents constituting a receipt stating that the Defendants had received the overcharges, however, they failed to fully disclose the overcharges on the receipts.

b. The Defendants were required to inventory all items of government intellectual property in their possession or control and disclose all such items on reports, records or other documents constituting receipts and failed to fully disclose the items of intellectual property on the receipts.

c. Defendant Bechtel fired the Relator rather than allow him to truthfully and accurately complete the inventory of intellectual property, and identify copyrighted data that should no longer be maintained by the Prime Contractor.

156. In violation of 31 USC § 3729(a) (1)(G), Defendants knowingly made, used, or caused to be made or used, false records or statements material to

an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, including, but not limited to, as follows:

a. As Prime Contractors, Defendants each possessed an obligation to the United States, as that term is defined at 31 USC § 3729(b) (3), in that the Prime Contracts entrusted the Defendants with possession and control of LANL as well as the appropriated government funds to be used for LANL's operation and management; and the Defendants were each accountable to the United States for the use of the funds and the amounts returnable to the government.

b. The Defendants failed to pay, or credit back to, the government the overcharges alleged herein, including, but not necessarily limited to, with their end of year report.

c. The Defendants failed to account for each item of government intellectual property under their control, and further failed to inform the government of each item that the Defendants were not taking good faith actions to commercialize.

## IX.   THE COUNTS

### COUNT I

### VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (A))

### Presenting False or Fraudulent Claims for Payment or Approval

157.   The Relator realleges and reasserts all prior allegations of this Complaint as though fully set forth herein and incorporates said allegations by reference in this Count.

158.   On multiple occasions, from in or before July 2006  and continuing to date, the Defendants knowingly, as the term "knowingly" is defined at 31 U.S.C. § 3729 (b) (1), presented, or caused to be presented, false or fraudulent claims, as the term "claim" is defined at 31 U.S.C. § 3729 (b) (2), for payment or approval, in violation of 31 U.S.C. § 3729 (a) (1) (A), causing the United States to sustain substantial damages.

159.   The false or fraudulent claims presented by the Defendants included, but were not limited to, each and every request for funds from the government, and each and every action by a Defendant resulting in the government's payment of funds or resulting in a Defendants' retention of such funds, when the amount was affected or impacted by the Defendants' actions alleged herein.

160.   The number of false or fraudulent claims presented, or caused to be presented, to the government by Defendants the Bechtel Prime Contractor Group (LANS, Bechtel, URS, BWX and University of California) exceeds 500 claims presented while Defendant LANS acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

161.   The number of false or fraudulent claims presented, or caused to be presented, to the government by Defendants Battelle Prime Contractor Group (Triad, Bechtel, Battelle, Texas A&M University and University of California) exceeds 100 claims presented while Defendant Triad acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

162.   The total number of false or fraudulent claims presented, or caused to be presented, by the Defendants will be determined by the trier of fact following discovery in this action, or otherwise as provided by applicable law and rules of procedure.

163.   As a result of the Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), each Defendant is liable to the United States government for 3 times the amount of damages which the government sustained because of the acts of the Defendant, plus a civil penalty, as provided by 31 U.S.C. § 3729 (a) (1), of not less than $5,000 for each and every violation committed by the Defendant,  and

between $5,500 and $11,000 for each violation of the Federal False Claims Act (in amounts periodically increased by law).

164.   The Relator, acting on behalf of the United States pursuant to the qui tam provisions of The False Claims Act (31 U.S.C. § 3730) is entitled to and seeks entry of a judgment for the benefit of the United States in the maximum amount of damages and penalties awardable pursuant to 31 U.S.C. § 3729 (a) (1) and other applicable law.

## COUNT II

## VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (B))

## False Records or Statements Material to a False or Fraudulent Claim

165.   The Relator realleges and reasserts all prior allegations in the preceding paragraphs of this Complaint as though fully set forth herein and incorporates said allegations by reference in this Count.

166.   On multiple occasions, from on or before July 2006  and continuing to date, the Defendants knowingly, as the term "knowingly" is defined at 31 U.S.C. § 3729 (b) (1), made, used, or caused to be made or used, false records or statements material, as the term material is defined at 31 U.S.C. § 3729(b) (4), to a false or fraudulent claims, as the term "claim" is defined at 31 U.S.C. § 3729 (b) (2), in

violation of 31 U.S.C. § 3729 (a) (1) (B), causing the United States to sustain substantial damages.

167.   The material false records or statements made or used, or caused to be made or used, by the Defendants included, but were not limited to, each and every false billing statement or entry, billing record, expense record, report relating to research and development and technology transfer activities, request for funds from the government, representation affecting the Defendants' right to receive funds from the government and representation about the Defendants' efforts to commercialize intellectual property developed at the government's expense that had a natural tendency to influence, or was capable of influencing, the payment or receipt of money or property.

168.   The number of material false records or statements made or used, or caused to be made or used, by Defendants the Bechtel Prime Contractor Group (LANS, Bechtel, URS, BWX and University of California) exceeds 1000 while Defendant LANS acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

169.   The number of material false records or statements made or used, or caused to be made or used, by Defendants the Battelle Prime Contractor Group (Triad, Battelle, Texas A&M University, and University of California) exceeds

1000 while Defendant Triad acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

170.   The total number of material false records or statements made or used, or caused to be made or used, by the Defendants will be determined by the trier of fact following discovery in this action, or otherwise as provided by applicable law and rules of procedure.

171.   As a result of the Defendants' violations of 31 U.S.C. § 3729 (a) (1) (B), each Defendant is liable to the United States government for a civil penalty, as provided by 31 U.S.C. § 3729 (a) (1), of between $5,500 and $11,000 for each violation of the Federal False Claims Act (in amounts periodically increased by law), plus 3 times the amount of damages which the government sustained because of the acts of the Defendant.

172.   The Relator, acting on behalf of the United States pursuant to the *qui tam* provisions of the False Claims Act (31 U.S.C. § 3730) seeks entry of a judgment for the benefit of the United States in the maximum amount of damages and penalties awardable pursuant to 31 U.S.C. § 3729 (a) (1) and other applicable law.

## COUNT III

## VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (D))

### Delivering Less Than all Money or Property to the Government

173.    The Relator realleges and reasserts all prior allegations of this Complaint in the preceding paragraphs as though fully set forth herein and incorporates said allegations by reference in this Count.

174.    On multiple occasions, from on or before July 2006  and continuing to date, the Defendants had possession, custody or control of property or money used, or to be used, by the government and knowingly, as the term "knowingly" is defined at 31 U.S.C. § 3729 (b) (1), delivered, or caused to be delivered, less than all of that money or property  in violation of 31 U.S.C. § 3729 (a) (1) (D), causing the United States to sustain substantial damages.

175.    The Prime Contracts, and applicable law and regulations,  provided for a funding method whereby LANS and Triad would be provided with substantial government funds in advance to be used and expended for the management and operation of LANL, in accordance with the requirements of the Prime Contract and other applicable law and the calculation of the fee and other amounts properly retained by the Prime Contractor would determine the amount of the government funds so advanced that could properly be retained by, and for the

benefit of, the Prime Contractor and the amount that would be returned to, or otherwise held for the benefit of, the United States.

176.   The Prime Contracts, and applicable law and regulations, provided that certain taxpayer funded intellectual property, including, but not limited to, property potentially subject to copyright protection, could be held and used by the Prime Contractors for the approved purposes set forth in the Prime Contracts, and applicable law and regulations; however, was required to be returned to the possession and control of the government in the event that the conditions set forth in the Prime Contracts, and applicable law and regulations, were not met.

177.   The fraudulent acts of the Defendants alleged herein resulted in the calculations of the amount of funds to be returned to, or otherwise held for the benefit of, the government to be continuously and systemically calculated to be substantially less than the amount would have been, but for the Defendants' fraudulent acts and, on each such instance and calculation, the Defendants delivered, or caused to be delivered, less than all of the money or property used, or to be used, by the government in violation of 31 U.S.C. § 3729 (a) (1) (D) .

178.   The fraudulent acts of the Defendants alleged herein resulted in the continuous and systemic failure of the Defendants to return taxpayer funded intellectual property to the government and, on each such instance the Defendants

106

delivered, or caused to be delivered, less than all of the money or property used, or to be used, by the government in violation of 31 U.S.C. § 3729 (a) (1) (D).

179.   The number of violations of 31 U.S.C. § 3729 (a) (1) (D) by Defendants LANS, Bechtel, URS, BWX and University of California exceeds 1000 violations while Defendant LANS acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

180.   The number of violations of 31 U.S.C. § 3729 (a) (1) (D) by Defendants Triad, Bechtel, Battelle, Texas A&M University and University of California exceeds 1000 claims presented while Defendant Triad acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

181.   The total number of violations of 31 U.S.C. § 3729 (a) (1) (D) by the Defendants will be determined by the trier of fact following discovery in this action, or otherwise as provided by applicable law and rules of procedure.

182.   As a result of the Defendants' violations of 31 U.S.C. § 3729 (a) (1) (D), each Defendant is liable to the United States government for a civil penalty, as provided by 31 U.S.C. § 3729 (a) (1), of between $5,500 and $11,000 for each violation of the Federal False Claims Act (in amounts periodically increased by law), plus 3 times the amount of damages which the government sustained because of the acts of the Defendants.

183.   The Relator, acting on behalf of the United States pursuant to the qui

tam provisions of the False Claims Act (31 U.S.C. § 3730) is entitled to and seeks

entry of a judgment for the benefit of the United States in the maximum amount of

damages and penalties awardable pursuant to 31 U.S.C. § 3729 (a) (1) and other

applicable law.

## COUNT IV

## VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (E))

### Making or Delivering a Document Certifying Receipt of Property
### to Defraud the Government

184.   The Relator realleges and reasserts all prior allegations of this

Complaint in the preceding paragraphs as though fully set forth herein and

incorporates said allegations by reference in this Count.

185.   With respect to the 2018 transition from the Bechtel Prime Contractor

Group to the Battelle Prime Contractor Group, the Defendants were required to

truthfully and accurately account for all of the intellectual property being managed

by the Prime Contractor, including preparing a receipt specifying the number of

copyrights and the Bechtel Prime Contractor Group Defendants, and such receipt

constituted a document certifying receipt of property used, or to be used, by the

government and, intending to defraud the government, the Bechtel Prime

Contractor Group Defendants made or delivered the receipt without completely

knowing that the information on the receipt was true in violation of 31 U.S.C. § 3729 (a) (1) (E), causing the United States to sustain substantial damages.

186. The Prime Contracts, and applicable law and regulations, provided for a funding method whereby LANS and Triad would be provided with substantial government funds in advance to be used and expended for the management and operation of LANL, in accordance with the requirements of the Prime Contract and other applicable law and the calculation of the fee and other amounts properly retained by the Prime Contractor would determine the amount of the government funds so advanced that could properly be retained by, and for the benefit of, the Prime Contractor and the amount that would be returned to, or otherwise held for the benefit of, the United States.

187. The Prime Contracts, and applicable law and regulations, provided that certain taxpayer funded intellectual property, including, but not limited to, property potentially subject to copyright protection, could be held and used by the Prime Contractors for the approved purposes set forth in the Prime Contracts, and applicable law and regulations; however, was required to be returned to the possession and control of the government in the event that the conditions set forth in the Prime Contracts, and applicable law and regulations, were not met.

188.   The fraudulent acts of the Defendants alleged herein included the Defendants, intending to defraud the government, making or delivering receipts for funds based on calculations of the amount of funds used, or to be used, by the government, without completely knowing that the information on the receipt was true in violation of 31 U.S.C. § 3729 (a) (1) (E).

189.   The fraudulent acts of the Defendants alleged herein included the Defendants, intending to defraud the government, making or delivering receipts relating to taxpayer funded intellectual property used, or to be used, by the government without completely knowing that the information on the receipt was true in violation of 31 U.S.C. § 3729 (a) (1) (E).

190.   The number of violations of 31 U.S.C. § 3729 (a) (1) (E) by Defendants LANS, Bechtel, URS, and BWX exceeds 20 violations while Defendant LANS acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

191.   The number of violations of 31 U.S.C. § 3729 (a) (1) (E) by Defendants Triad and Battelle, exceeds 20 claims presented while Defendant Triad acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

192.   The total number of violations of 31 U.S.C. § 3729 (a) (1) (E) by the Defendants will be determined by the trier of fact following discovery in this action, or otherwise as provided by applicable law and rules of procedure.

193.   As a result of the Defendants' violations of 31 U.S.C. § 3729 (a) (1) (E), each Defendant is liable to the United States government for a civil penalty, as provided by 31 U.S.C. § 3729 (a) (1), of between $5,500 and $11,000 for each violation of the Federal False Claims Act (in amounts periodically increased by law), plus 3 times the amount of damages which the government sustained because of the acts of the Defendant.

194.   The Relator, acting on behalf of the United States pursuant to the *qui tam* provisions of the False Claims Act (31 U.S.C. § 3730) is entitled to and seeks entry of a judgment for the benefit of the United States in the maximum amount of damages and penalties awardable pursuant to 31 U.S.C. § 3729 (a) (1) and other applicable law.

## COUNT V

## VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (G))

### False Record or Statement Material to, or Improperly Avoiding or Decreasing, an Obligation to Pay or Transmit Money or Property to the Government

195.   The Relator realleges and reasserts all prior allegations of this Complaint in the preceding paragraphs as though fully set forth herein and incorporates said allegations by reference in this Count.

196.   On multiple occasions, from on or before April 1, 2015 and continuing to date, the Defendants knowingly, as the term "knowingly" is defined at 31 U.S.C. § 3729 (b) (1), made, used, or caused to be made or used, a false record or statement material, as the term material is defined at 31 U.S.C. § 3729 (b) (4),  to an obligation, as the term obligation, is defined at 31 U.S.C. § 3729 (b) (3), to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729 (a) (1) (G), causing the United States to sustain substantial damages.

197.   The Prime Contracts, and applicable law and regulations,  provided for a funding method whereby LANS and Triad would be provided with substantial government funds in advance to be used and expended for the

112

management and operation of LANL, in accordance with the requirements of the Prime Contract and other applicable law and the calculation of the fee and other amounts properly retained by the Prime Contractor would determine the amount of the government funds so advanced that could properly be retained by, and for the benefit of, the Prime Contractor and the amount that would be returned to, or otherwise held for the benefit of, the United States.

198. The Prime Contracts, and applicable law and regulations, provided that certain taxpayer funded intellectual property, including, but not limited to, property potentially subject to copyright protection, could be held and used by the Prime Contractors for the approved purposes set forth in the Prime Contracts, and applicable law and regulations; however, was required to be returned to the possession and control of the government in the event that the conditions set forth in the Prime Contracts, and applicable law and regulations, were not met.

199. The false records and statements of the Defendants alleged herein were material to the Defendants' obligation to account to the government for all government funds used to manage and operate LANL and to the amount of money and property the Defendants were obligated to transmit to the government during their time as Prime Contractor and at the conclusion thereof.

200.   The Defendants' knowingly concealed, avoided and decreased their obligation to account to the government for all government funds used to manage and operate LANL and to pay and transmit money and property the government during their time as Prime Contractor and at the conclusion thereof.

201.   The number of violations of 31 U.S.C. § 3729 (a) (1) (G) by Defendants LANS, Bechtel, URS, and BWX exceeds 1000 violations while Defendant LANS acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

202.   The number of violations of 31 U.S.C. § 3729 (a) (1) (G) by Defendants Triad, Bechtel, and Battelle exceeds 1000 claims presented while Defendant Triad acted as Prime Contractor, causing the United States to sustain more than $10 million in damages.

203.   The total number of violations of 31 U.S.C. § 3729 (a) (1) (G) by the Defendants will be determined by the trier of fact following discovery in this action, or otherwise as provided by applicable law and rules of procedure.

204.   As a result of the Defendants' violations of 31 U.S.C. § 3729 (a) (1) (G), each Defendant is liable to the United States government for a civil penalty, as provided by 31 U.S.C. § 3729 (a) (1), of between $5,500 and $11,000 for each violation of the Federal False Claims Act (in amounts periodically increased by

law), plus 3 times the amount of damages which the government sustained because of the acts of the Defendant.

205.    The Relator, acting on behalf of the United States pursuant to the qui tam provisions of The False Claims Act (31 U.S.C. § 3730) is entitled to and seeks entry of a judgment for the benefit of the United States in the maximum amount of damages and penalties awardable pursuant to 31 U.S.C. § 3729 (a) (1) and other applicable law.

## COUNT VI

## VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a) (1) (C))

## Conspiring to Commit Violations of the False Claims Act

206.    The Relator realleges and reasserts all prior allegations of this Complaint in the preceding paragraphs as though fully set forth herein and incorporates said allegations by reference in this Count.

207.    From on or before April 1, 2015 and continuing to date, the Defendants, acting in concert and in pursuit of a common purpose, conspired to commit the violations of  the False Claims Act (31 U.S.C. § 3729 (a) (1) (A) (B) (D) (E) and (G)) as alleged in this Complaint, causing the United States to sustain substantial damages.

208.   Defendants LANS, Bechtel, URS, and BWX initiated the conspiracy alleged herein by combining together to secure the Prime Contract enabling them to manage and operate LANL beginning  in or about December 2015 by representing to the United States that they would use their combined resources, experience and expertise to operate LANL and to exercise stewardship over the taxpayer funds provided by the government for LANL in the manner required by the Prime Contract and applicable law and regulations.

209.   During the period that Defendants LANS, Bechtel, URS, and BWX managed and operated LANL through LANS as the Prime Contractor, Defendants LANS, Bechtel, URS, and BWX directed, initiated, permitted and tolerated the actions alleged herein in violation of the False Claims Act and otherwise failed to take action to stop the violations, report them to the government and voluntarily make restitution of amounts necessary to cover the damages sustained by the government.

210.   Defendants LANS, Bechtel, URS, and BWX each knew that they had a duty to the United States to identify and correct actions in violation of the False Claims Act; however, they failed to do so and, instead, enabled and caused the concealment of the violations from the government.

211.   Management employees put in place at LANL who directed, and knowingly permitted, the False Claims Act violations alleged in this Complaint included, but were not limited to, Mr. B., who possessed knowledge of the violations, directly committed certain of the violations, exercised control over acts at LANL giving rise to the violations and terminated the Relator's employment to conceal the violations.  Defendants LANS, Bechtel, URS, and BWX are each liable for the actions of LANS employees such as Mr. B and each Defendant had a duty to the government to take action to inform the government of False Claims Act violations committed or tolerated by such employees and to stop such violations.

212.   Defendants Triad and Battelle joined the conspiracy alleged herein by combining together, to secure the Prime Contract enabling them to manage and operate LANL beginning in or about November 2018 by representing to the United States that they would use their combined resources, experience and expertise to operate LANL and to exercise stewardship over the taxpayer funds provided by the government for LANL in the manner required by the Prime Contract and applicable law and regulations.

213.   When Defendants Triad and Battelle commenced management and operation of LANL in or about November 2018, they retained all or most of the

former LANS employees who had committed the False Claims Act violations alleged in this Complaint while LANS acted as the Prime Contractor, including but not limited to, Mr. B.

214.   Defendants Triad and Battelle each had a duty to identify and report to the government any False Claims Act violations occurring, or of which they became aware, while they managed and operated LANL through Triad.

215.   Defendants Triad and Battelle each had a responsibility to insure appropriate supervision and oversight of Triad's management and operation of LANL and acted through, and are liable for the actions of, Triad management employees including, but not limited to, Mr. B, who acted to continue and perpetuate the pervasive and systemic False Claims Act violations that had occurred when LANS acted as Prime Contractor.

216.   The acts and knowledge of management employees including, but not limited to Mr. B, are attributed to Defendants Triad and Battelle.

217.   Defendants Triad and Battelle, acting through management employees including, but not limited to Mr. B, knowingly continued, and perpetuated the pervasive and systemic False Claims Act violations that had occurred when LANS acted as Prime Contractor and further acted to conceal, from the government, the

prior False Claims Act violations occurring when LANS had acted as Prime Contractor.

218.   Each individual Defendant is liable for the unlawful acts of all other Defendants, including, but not limited to False Claims Act violations, attributable to the individual Defendant because of the individual Defendants' participation in the conspiracy alleged herein including, but not limited to:

    a.  Defendants LANS, Bechtel, URS, and BWX are each liable for the False Claims Act violations relating to the time that LANS was the Prime Contractor as they jointly combined together and persuaded the United States to award LANS the Prime Contract by representing that they would use their combined resources, expertise and experience to manage and operate LANL and would each be responsible for any loss to the government resulting from the lack of promised oversight; however, they permitted LANS employees such as Mr. B to commit the False Claims Act violations alleged herein and concealed the violations from the government.

    b.  Defendants Triad and Battelle are each liable for the False Claims Act violations relating to the time that Triad has been the Prime Contractor as they jointly combined together, with the other members

of Triad LLC, and persuaded the United States to award Triad the Prime Contract by representing that they would use their combined resources, expertise and experience to manage and operate LANL and would each be responsible for any loss to the government resulting from the lack of promised oversight; however, they permitted Triad employees such as Mr. B to commit the False Claims Act violations alleged herein and concealed the violations from the government.

c.  Defendants LANS, Bechtel, URS, and BWX are each liable for the False Claims Act violations relating to the time that Triad has been the Prime Contractor because the systemic and pervasive False Claims Act violations relating to the time that LANS acted as the Prime Contractor were continued and perpetuated by Triad and Battelle and employees including, but not limited to, Mr. B, who with knowledge of the continued and perpetuated violations acted, on behalf of Triad, to conceal the False Claims Act violations relating to the time that LANS acted as the Prime Contractor in order to continue the violations while Triad has been the Prime Contractor.

d.  Defendants Triad and Battelle are each liable for the False Claims Act violations relating to the time that LANS was the Prime Contractor

because the systemic and pervasive False Claims Act violations

relating to the time that LANS acted as the Prime Contractor were

concealed, continued and perpetuated by Triad and Battelle and

employees including, but not limited to, Mr. B, who with knowledge

of the continued and perpetuated violations, acted, on behalf of Triad,

to conceal the False Claims Act violations relating to the time that

LANS acted as the Prime Contractor in order to continue the

violations while Triad has been the Prime Contractor.

219.   The Defendants are each jointly and severally liable for any and all

False Claims Act violations committed during the course of, or in furtherance of,

the conspiracy alleged herein, and the acts of any co-conspirator committed during

the course of, or in furtherance of, the conspiracy alleged herein are attributed to

all of the co-conspirators.

220.   As a result of the Defendants' violations of 31 U.S.C. § 3729 (a) (1)

(C), each Defendant is liable to the United States government for a civil penalty, as

provided by 31 U.S.C. § 3729 (a) (1), of between $5,500 and $11,000 for each

violation of the Federal False Claims Act (in amounts periodically increased by

law), committed during the course of, or in furtherance of, the conspiracy alleged

herein, plus 3 times the amount of damages which the government sustained because of the violations.

221.   The Relator, acting on behalf of the United States pursuant to the qui tam provisions of the False Claims Act (31 U.S.C. § 3730) seeks entry of a judgment for the benefit of the United States in the maximum amount of damages and penalties awardable pursuant to 31 U.S.C. § 3729 (a) (1) and other applicable law.

## COUNT VIII

## RELATOR'S CLAIM FOR RELIEF DUE TO RETALIATORY ACTIONS PURSUANT TO THE FALSE CLAIMS ACT (31 U.S.C. § 3730 (h))

### Retaliation Against Relator for Lawful Acts in Furtherance of an Action Under, or to Stop Violations of, the False Claims Act

222.   The allegations of the preceding paragraphs are incorporated by reference.

223.   As detailed above, Defendants retaliated against Relator because of lawful acts by Relator to stop one or more violations of the False Claims Act and/or lawful acts by Relator in furtherance of an action under 31 U.S.C. § 3730. This retaliation included, but was not limited to, termination of Relator's employment.

224.   As a result of Defendants' actions, Relator has suffered damages in an amount to be determined at trial.

225.   The Relator seeks, on behalf of himself, an award of all relief necessary to make Relator whole for Defendants' violation of 31 U.S.C. § 3730(h), including reinstatement, two times the amount of back-pay, interest on the back-pay, compensation for special damages, and any and all other damages, costs, expenses, attorneys 'fees and other relief provided by 31 U.S.C. § 3730(h).

## X.   PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of himself and on behalf of the United States requests the following relief:

a)   That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages sustained by the United States because of the Defendants' acts;

b)   That the Court enter judgment against the Defendants for civil penalties of between $5,500 and $11,000 for each violation of the Federal False Claims Act (in amounts periodically increased by law), and not more than the amount provided for by 31 U.S.C. §§ 3030 and 3031 and 28 U.S.C. § 2461;

c)       That the Court enter such orders and grant such relief as appropriate against the Defendants and against any party that guaranteed or is otherwise determined to be obligated to satisfy the liability of any Defendant;

d)       That the Relator be permitted to pursue necessary actions following an entry of judgment against the Defendants to satisfy such judgment on behalf of the United States and to pursue such pre-judgment remedies as may be available under the law;

e)       That the Relator be awarded an amount, as provided by 31 U.S.C. § 3730(d), of not less than 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes and proceeds with the action, and not less than 25 percent but not more than 30 percent of the proceeds of the action or settlement of the claim if the government does not intervene and proceed with the action;

f)       That the Relator, and if appropriate the Relator's counsel, be awarded, against the Defendants, an amount for reasonable expenses necessarily incurred by the Relator plus reasonable attorney's fees and costs;

g)       That the Relator be awarded any and all relief necessary to make Relator whole for Defendants' violation of 31 U.S.C. § 3730(h), including reinstatement, two times the amount of back-pay, interest on the back-pay,

124

compensation for special damages, and all other damages, costs, expenses, attorneys' fees and other relief provided by 31 U.S.C. § 3730(h); and

h)      That the Court grant such other and further relief as is appropriate.

Trial by jury is hereby requested.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the forgoing document complies with the font and point selections approved by the Court in L.R. 5.1(C). This document was prepared using Times New Roman 14-point font.

*/s/: James J. Breen*
James J. Breen, Esq.
Georgia Bar No. 079275
The Breen Law Firm, PA
5755 North Point Parkway
Suite 260
Alpharetta, Georgia  30022
(770) 740-0008 telephone
(770) 740-9109 fax
jbreen@breenlaw.com

Michael A. Sullivan, Esq.
Georgia Bar No. 691431
FINCH McCRANIE, LLP
225 Peachtree St., NE
1700 South Tower
Atlanta, Georgia 30303
(404) 658-9070 telephone
(404) 688-0649 fax
msullivan@finchmccranie.com

*Attorneys for Plaintiff-Relator*

125